**Brett MELTON, Appellant–Plaintiff,**

v.

**James OUSLEY, Appellee–Defendant.**

No. 91A02–0909–CV–902.

Court of Appeals of Indiana.

April 15, 2010.

Andrew W. Gruber, Christopher R. Taylor, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellant.

James D. Johnson, James B. Godbold, Rudolph, Fine, Porter & Johnson, LLP, Evansville, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Brett Melton appeals the trial court's order granting summary judgment in favor of James Ousley on Melton's complaint alleging defamation and tortious interference with a contractual employment relationship. Melton raises four issues for review, which we consolidate and restate as:

1. Whether there is a genuine issue of material fact as to whether Ousley's allegedly defamatory statements regarding Melton were true.

2. Whether there is a genuine issue of material fact precluding the entry of summary judgment on Melton's claim alleging Ousley's tortious interference with a contractual employment relationship.

We affirm.

### FACTS AND PROCEDURAL HISTORY

Melton is a professional golfer, a golf instructor, a member of the PGA of America ("PGA"),[1] and a member of the Indiana Section of the PGA ("Indiana Section"). The PGA classifies its professional members according to types of professional golf employment. There are twenty-four levels of "Class A" membership in the PGA. To maintain membership at a particular Class A level, the member's "primary employment" must meet the definition for that level of classification. Appellant's App. at 200. To satisfy the "primary employment" requirement, "the employment must show a pattern of employment that is regular, continuous, at the place of employment and provide the public with golf[-]related goods and/or services." *Id.*

The PGA and the Indiana Section run separate tournaments. Some of the Indiana Section tournaments are qualifier events for the PGA tournaments. The Indiana Section also has its own rules that determine the type and number of events in which an Indiana Section member may play. Participation in certain tournaments is limited by PGA classification.

In 2002, Melton was working as an assistant golf professional in Terre Haute, where he held an A–8 classification.[2] That

---

**1.** The PGA of America, a separate organization from the PGA Tour, is divided into forty-one geographical sections. The parties have provided detailed background information about the organizational structure of the PGA of America in their briefs, but not all of the

supporting authority has been included in the record on appeal.

**2.** Members in the A–8 classification are "employed as Assistant Golf Professionals at PGA

year, he moved to Illinois, where he worked again as an assistant golf professional. Melton later took a job as a golf instructor at a PGA-recognized facility in Illinois. With this change in position, Melton changed his classification to A–6. A member with an A–6 classification works predominantly as a golf instructor.

In 2006, Melton and his family moved back to Indiana. Melton applied to change his PGA classification from an A–6 teaching professional in the Illinois Section to the same classification in the Indiana Section. The PGA approved that change. In August, Melton accepted a teaching position at Country Oaks Golf Club in Montgomery. There he worked under Chad Crane, the club's head golf professional. Melton also worked in the club's pro shop.

Ousley is the head golf professional at the Tippecanoe Country Club in Monticello. He is also a golf professional, a golf instructor, and a member of the Indiana Section. Ousley's PGA classification is A–1. Ousley and Melton were acquaintances in college and had crossed paths a few times on golf courses since college. Ousley frequently reviewed tournament results, noting the performances of his friends and acquaintances. As a result, Ousley was familiar with the number of tournaments in which Melton had been playing.

After Melton transferred to the Indiana Section, Ousley told some other Indiana Section members that Melton was a "cheat," a "cheater," and was "cheating the system." Melton understood these state-ments to refer not to "something that had happened while [he] was playing golf" but to the fact that he was "playing in the Indiana Section tournaments[.]" *Id.* at 94–95. In August Ousley contacted Mike David, the Executive Director of the Indiana Section, expressing concern about whether Melton's main employment qualified him to be classified as a teaching professional. At David's request, Ousley put his concerns in a letter addressed to David. After recounting his understanding of Melton's professional activities, Ousley closed by stating: "This fall after he [Melton] transferred into Indiana I was apprehensive he is working at all [sic] and I feel it is unfair for him to be able to play all over the country and then come home to Indiana and play in our [Indiana Section] events." *Id.* at 240.

The Indiana Section launched an investigation to verify Melton's qualification to be classified as a teaching professional.[3] Following its procedure for such situations, the Section asked Tom Brawley, PGA Membership Director, to send Melton a letter requesting documentation to substantiate Melton's employment status. In response, Melton sent a copy of his most recent paycheck, his "most recent lesson book[,] and [Country Oaks'] work schedule" for the following two weeks. *Id.* at 242. After reviewing that documentation, Brawley sent a letter to Melton stating that Melton's "employment is considered ineligible and [he] will be an A–6 in [his] Grace Period as of October 13, 2006[,]" the date of that letter.[4] *Id.* 241.

Recognized Facilities[.]" Appellant's App. at 198.

**3.** The parties have not provided a copy of the Indiana Section's 2006 written request, if any, for documentation to verify Melton's employment status. In his brief, Melton cites to the PGA Board of Control letter in the appendix in reference to the initial investigation by the Indiana Section.

**4.** Neither this letter nor the parties explain what is meant by this reference to Melton being ineligible and yet still an A–6 in his "Grace Period" as of the date of that letter. Nor has our review of the appendix disclosed any explanation for the use of this phrase on

Melton appealed that determination to the Board of Control and requested to "remain a Class A–6 in the Indiana Section." *Id.* at 248. By a letter dated December 18, 2006, Brawley informed Melton that the Board of Control had denied Melton's request. A similar letter was sent to Crane. Both letters listed the information required for Melton to regain eligibility. Melton appealed that decision to the National Board of Directors.

On February 13, 2007, Allen F. Wronowski, Secretary of the PGA, sent a letter to Melton, notifying him that the National Board of Directors had upheld the decision of the Board of Control. That letter again instructed Melton what documentation was necessary to regain eligibility. The following day, Wronowski sent a letter to Crane, seeking to verify Melton's employment. Crane did not respond to that letter. But Melton forwarded information regarding Melton's Golf Academy, which he had started at Country Oaks.

On July 8, 2007, Melton again submitted to the Indiana Section documentation to substantiate his employment. On August 3, 2007, four Indiana Section officers sent a letter to Melton, stating that, upon review of the documents he had submitted regarding his employment with his golf academy, the officers had determined that his "employment as an A–6 was not substantiated and [they] deemed his employment ineligible." *Id.* at 281. Melton again appealed the decision to the Board of Control, which upheld the Indiana Section's

decision. Melton appealed to the Board of Directors, which upheld the decisions of the Indiana Section and the Board of Control. Melton finally substantiated eligible employment as an A–6 member in December 2008.

During the course of Melton's appeals and attempts to verify employment qualifying him as an A–6, Melton hired an attorney to represent him with regard to the alleged defamation by Ousley. On May 21, 2007, Melton's attorney wrote to Ousley, instructing him to "cease and desist [his] wrongful conduct" with respect to Melton. *Id.* at 19. Ousley's former counsel, L. Dowell Dellinger, replied to Melton's counsel in a letter dated May 24 ("Dellinger Letter"). The Dellinger Letter provides, in part:

> If you are a golfer, you will know that golf is a game which teaches individuals to play by a strict set of rules. The game speaks volumes as to the measure of a man based upon how he chooses to play the game. Some play by most of the rules, some play by all of the rules, and some choose to disregard the rules in total. The manner in which a man approaches the game of golf is often the same manner in which he approaches the game of life.

> Mr. Melton chose to play in PGA section events while not employed as a golf professional, a violation of PGA rules for section events. Thus, he cheated. In my client's opinion, this makes Mr. Mel-

---

the facts presented. However, we did find in the Appellant's Appendix a partial excerpt of the PGA Bylaws regarding classification procedures. This excerpt provides, in part, that "[a]ctive members, who become unemployed, are not eligible for classification as Life Members, and who do not elect to be classified as Inactive Members shall enter a one[-] (1[-])year grace period. If, by the end of that grace period, such Members continue not to be eligible for classification as Active or Life

Members, they shall be reclassified as Inactive Members at the beginning of the Association's next fiscal year." Appellant's App. at 201. This provision is not completely applicable. But the record shows that, and the parties discuss the matter as if, Melton continued to be classified as an A–6, although only provisionally, until late in 2008. As such, we understand the reference to a grace period to mean that Melton was granted probationary A–6 status for some period of time.

ton by definition a "cheater." Mr. Ousley's description of Mr. Melton as a cheater is thus accurate and truthful, a complete bar to any claim of tortious interference of contract [sic] or slander irregardless [sic] of my client's intentions. Mr. Ousley's opinion that Mr. Melton is a cheater will stick with him based upon your client's previous actions. Should anyone ask Mr. Ousley of his opinion of Mr. Melton, he will continue to describe Mr. Melton as a cheater. On the golf course or on the playground, once a cheater, always a cheater. I am reminded of a quote from Bob Feller:

> You figure they cheat at the ballpark, they'll cheat on the golf course, they'll cheat in business, and anything else in life. Players may laugh about it and say it's funny, but right down in their heart [sic], they don't think it's funny at all, and they have no respect for a person who cheats.

I suggest if your client does not wish to be branded with the label "cheater" that he find gainful employment as a PGA professional before he applies to play in events for club professionals. Furthermore, should your client desire to change the minds of actual club professionals who play in the section events, he may desire to write a letter of apology for his inappropriate actions to each of those professionals, including Mr. Ousley.

*Id.* at 20.

On July 3, 2007, Melton filed a complaint against Ousley alleging two counts: defamation and tortious interference with his "relationship with his employer[.]" *Id.* at 13. Ousley filed a motion for summary judgment, a supporting brief, and his designation of evidence in support of that motion. Melton filed a response in opposition to summary judgment and a designation of evidence in support of his response.

Ousley then filed a reply brief. The court held a hearing on August 13, 2009, and took the matter under advisement. On August 24, the court entered its order granting summary judgment in favor of Ousley. That order provides, in relevant part:

> Whether [Ousley] called [Melton] a "cheat" or "a cheater", or that [Ousley] "was cheating the system", is not critical to this Court's decision, because it is not in dispute that the plain, natural, and intended meaning of [Ousley's] statements was that [Melton] "was cheating the PGA classification system."

\* \* \*

> The Indiana Section of the PGA, the National PGA Board of Control and the National PGA Board of Directors, all found that [Melton] was not eligibly employed and did not meet the requirements for an Indiana PGA Member A–6 classification for 2006 and 2007. A review of the income earned by [Melton] in 2005 and 2006 support the indisputable fact that [Melton] was earning his living by playing golf and not by teaching golf. That was true for 2005 and 2006. [Melton] did not meet the employment eligibility requirements for an A–6 classification in Indiana for 2006, and he failed to provide the Indiana Section of the PGA sufficient documentation to support his employment eligibility for an A–6 classification for 2007. That's the truth.

> As a matter of law, [Ousley] is entitled to summary judgment on [Melton's] claim for defamation because [Ousley's] statements were true.

> [Melton] is also seeking to recover from [Ousley] based upon a claim of tortious interference with a business relationship. In order to recover for tortious interference, a plaintiff must show: (1) the existence of a valid relationship; (2) defendant's knowledge of the exis-

tence of the relationship; (3) defendant's intentional interference with that relationship; (4) the absence of justification; and (6) damages resulting from defendant's wrongful interference with the relationship. *Baker v. Tremor*, 890 N.E.2d 73, 85 (Ind.Ct.App.2008). Further, the Indiana Supreme Court has held that tortious interference with a business relationship requires the additional showing that a defendant acted illegally in achieving his end. *Government Payment Service, Inc. v. Ace Bail Bonds*, 854 N.E.2d 1205, (Ind.Ct.App. 2006) (citing *Brazaukas v. Fort Wayne–South Bend Diocese. Inc.*, 796 N.E.2d 286, 291 (Ind.2003)[) ].

Illegal conduct is an essential element of tortious interference with a business relationship and defamation does not satisfy the illegality requirement. *Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct.App.2000). [Melton] has not shown [Ousley's] conduct was illegal. His complaint alleges no conduct other than defamation.

Furthermore, no evidence was presented to support the claim that [Ousley] interfered with any business relationship that [Melton] was involved in. In 2006 [Melton] was employed at the Country Oaks Country Club, though minimally, giving golf lessons. Nothing was presented to indicate that [Ousley's] statements impacted [Melton's] ability to teach golf lessons at Country Oaks in 2006. In fact, [Melton] continued to teach golf lessons through a golf academy that he established at the Country Oaks Country Club in 2007 and no evidence was presented to indicate that [Ousley's] actions impacted [Melton's] ability to teach golf lessons at County [sic] Oaks in 2007.

Finally, [Ousley's] actions in no way interfered with [Melton's] income from playing golf. [Melton] continued to play in tournaments in 2006 and in 2007, and the majority of his earnings continued to come from playing in tournaments.

As a matter of law, [Ousley] is therefore entitled to summary judgment on [Melton's] claim for tortious interference with a business relationship because [Ousley's] conduct was not illegal and because the evidence failed to establish that [Ousley] interfered in any business relationship of [Melton].

*Id.* at 6–8. Melton now appeals.

## DISCUSSION AND DECISION

### Standard of Review

Melton appeals from the trial court's grant of summary judgment in favor of Ousley. Our standard of review for summary judgment appeals is well established:

When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

*Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269–70 (Ind.2009)

(citations omitted). We may affirm a summary judgment ruling if it is sustainable on any legal theory or basis found in the evidentiary matter designated to the trial court. *Tony v. Elkhart County*, 918 N.E.2d 363, 367 (Ind.Ct.App.2009). The party appealing from a summary judgment decision has the burden of persuading this court that the grant or denial of summary judgment was erroneous. *Knoebel v. Clark County Superior Court No. 1*, 901 N.E.2d 529, 531–32 (Ind.Ct.App.2009). We review questions of law de novo, and therefore we give no deference to the trial court's interpretation. *Id.*

### Issue One: Defamation[5]

Melton contends that the trial court erred when it granted summary judgment in favor of Ousley on the defamation claim. Specifically, he contends that the trial court erroneously determined that Ousley's statements are not susceptible to a defamatory meaning because the statements at issue were true. We conclude that Ousley's statements were true, thus establishing a complete defense.

 The law of defamation was created to protect individuals from reputational attacks. *Hamilton v. Prewett*, 860 N.E.2d 1234, 1243 (Ind.Ct.App.2007), *trans. denied.* A defamatory communication is defined as one that " 'tends so to harm the reputation of another as to lower him in estimation of the community or to deter a third person from associating or dealing with him.' " *Id.* (citing *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 686 (Ind.1997) (quoting Restatement (Second) of Torts § 559 (1977))). To prevail on a cause of action for defamation, a plaintiff must prove four elements: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Id.* "To impose liability for defamation, a false statement of fact is required." *Id.* But truth is a complete defense in civil actions for defamation. *See Doe*, 690 N.E.2d at 687; *see also* Ind. Const. art. I, § 10 ("In all prosecutions for libel, the truth of the matters alleged to be libelous may be given in justification.").

### *Statements to Golf Professionals*

 We first consider whether Ousley's statements about Melton to other golf professionals were defamatory.[6] Melton claims that Ousley told other golf professionals that Melton was a "cheat," a

---

5. Melton has not supported his contentions in the argument section of his brief with adequate citations to the appendix or record on appeal. Indeed, Melton cited only three sources in the whole of his argument: the summary judgment order on appeal, a single page from the Response in Opposition to Summary Judgment, and a single page in the appendix representing any one of four pages of Melton's deposition. The lack of adequate supporting citations violates Indiana Appellate Rule 46(A)(8)(a), which requires the argument section of the brief to include supporting citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on. Melton's failure to provide supporting citations compelled this court, for each evidentiary matter mentioned in his argument, to locate mention of the same evidentiary material in the Statement of Facts for a supporting citation to the record and then review that material in the appendix. Where the cited material consisted only of pleadings filed below but not evidentiary matter in itself, we were compelled to locate within that pleading the supporting citation in order to find and review the cited evidentiary material, if included in the record before us. Such practice is burdensome and annoying. We remind counsel to provide supporting citations in accordance with Rule 46(A)(8)(a) in the future or run the risk of waiving an issue for review.

6. Although Melton presents a combined argument regarding all of Ousley's allegedly defamatory statements, we address the statements to other golf professionals separately from the statements in the Dellinger letter.

"cheater" and was "cheating the system." But according to the designated evidentiary material, all of the statements Ousley made were couched at some point in terms of his allegation that Melton was not eligibly employed to be classified as an A–6, a teaching professional. And, again, participation in certain tournaments is based on a member's classification. If a tournament were open to only members classified as an A–6, someone who spends most of his time playing in professional tournaments would have an advantage over a player who spent most of his time teaching, leaving little time to practice.

Most importantly, the designated evidence shows that, between the time of Ousley's first contact with the Indiana Section Executive Director and 2008, Melton was unable to establish to the Indiana Section, the national Board of Control, or the national Board of Directors that his employment qualified him to be classified as an A–6. Regardless of whether Melton played in any Class A–6 tournaments during the period in question, he had transferred to the Indiana Section in a classification for which he indisputably was not eligible. Ousley's statements that Melton's classification at the A–6 level did not comply with PGA rules were borne out. Accordingly, Ousley's comments that Melton was a cheat, a cheater, or cheating the system were true, and Melton has not shown the existence of a genuine issue of material fact on this issue.

While Melton acknowledges that truth is a defense to a defamation claim, he suggests that, "[t]o bar a defamation action, the 'truth' 'must extend to the innuendo, the [defamatory] implications and insinuations, as well as to the direct accusations of the statement.'" Appellant's Brief at 20 (quoting *Cochran v. Indianapolis Newspapers,* 175 Ind.App. 548, 372 N.E.2d 1211, 1217 (1978)). He then argues that the evidence

> show[s] that Ousley's "cheater" statements carried with them both explicit and implicit insinuations that Melton cheated at golf, that he would cheat in business, and that he would cheat in life. In the face of such insinuations, Ousley cannot hide behind the shield of "truth" as a defense, and the trial court was wrong to conclude as a matter of law that Ousley's "cheater" statements were true.

*Id.* at 20.

In *Cochran,* a newspaper ran an article investigating alleged corruption in the prosecutor's office. The article quoted a woman as saying that she had "'political connections' and kn[ew] a lot of 'prominent local officials who [could] keep her son out of prison[.]'" 372 N.E.2d at 1216. The woman and her daughter filed a complaint alleging defamation, and the trial court granted summary judgment in favor of the newspaper and the article's reporters.

On appeal, this court considered the article in the context of a suggestion in the article that such advantages had "in fact led to illegal activities[.]" *Id.* The court observed that the "implication of the statement was that the woman had used these 'connections' in the prosecutor's office to effect the criminal act of impeding the issuance of a warrant" for her son's arrest. *Id.* The court further noted that a "false implication or impression may be created by the positioning of true statements and headlines [] and the defense of truth must extend to the innuendo, the libelous implications and insinuations, as well as to the direction accusations in the statement." *Id.* at 1217 (citations omitted). Thus, the court concluded that the article was capable of two meanings and, therefore, reversed the entry of summary judgment in

favor of the newspaper and the reporters. *Id.* at 1222.

■ Melton claims that Ousley's statements could have been interpreted to mean that Melton cheated in business and in life, outside of Melton's connections to golf. In other words, Melton contends that the trial court erred when it found that Ousley's statements were not subject to a defamatory meaning. But whether a statement in its entirety is susceptible to a defamatory meaning is a question of law for a court to decide. *Journal–Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 457 (Ind.1999), *cert. denied*, 528 U.S. 1005, 120 S.Ct. 499, 145 L.Ed.2d 385 (1999). In making such a determination, the communication is to be viewed in context and given its plain and natural meaning. *Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 923 (Ind.Ct.App.2002).

Here, the trial court found that "the plain, natural, and intended meaning of [Ousley's] statements was that [Melton] was cheating the PGA classification system." Appellant's App. at 6. In other words, the court found as a matter of law that, given the context, Ousley's statements were not susceptible to a defamatory meaning. *See Gatto*, 774 N.E.2d at 923. Melton has not provided sufficient citation to the appendix or the record on appeal to show that that determination was in error.[7] And, in any event, the allegedly defamatory statements to other golfers as designated by Melton were all made in the context of Melton violating PGA rules by holding himself out as a teaching professional when he spent most of his time playing in tournaments. Melton has not shown that a true statement has been presented in a false light as was done in *Cochran*.

Again, "truth is a complete defense to defamation." *Gatto*, 774 N.E.2d at 924. We have already determined that Ousley's statements and the Dellinger letter, all of which pertained to Melton's eligibility to be classified as an A–6, were true. Thus, the trial court did not err when it concluded that, as a matter of law, Ousley was entitled to summary judgment on the defamation claim because his statements were true.

### Dellinger Letter

■ Melton also contends that the statements in the Dellinger Letter were defamatory. Again, he argues that Ousley's statements could have been interpreted to mean that Melton cheated not only in golf, but also in business and in life. But defamation requires publication. And this court has held that publication to an agent of a plaintiff who is acting at the plaintiff's behest and on his behalf is tantamount to a publication to the plaintiff himself, and such does not fulfill the publication requirement. *Brockman v. Detroit Diesel Allison Div. of General Motors Corp.*, 174 Ind.App. 240, 366 N.E.2d 1201, 1203 (1977). Here, the Dellinger letter was addressed to Melton's attorney, who was acting at Melton's behest and on his behalf. As such, the Dellinger letter does not satisfy the publication requirement and cannot form the basis of a defamation claim. *See id.*

Regardless, the trial court found that plain, natural, and intended meaning of Ousley's statements, including those in the Dellinger letter, referred to Melton's cheating the PGA classification system. Melton is a professional golfer and, therefore, golf is his business. To the extent that letter implies that he cheats in business, we conclude that such is true. Re-

---

7. Without adequate citation to the Appendix in his Argument, Melton also has not shown that the court failed to construe all designated evidentiary materials on summary judgment in favor of him as the non-movant.

garding any reference to cheating in life, again, the statement must be viewed in the context of the entire letter, and we conclude, again, that that reference goes to Melton's cheating the PGA classification system. Melton has not shown that the trial court erred in granting summary judgment in favor of Ousley on the defamation claim with regard to the Dellinger letter.[8]

### Issue Two: Tortious Interference with a Contractual Relationship

■■ Melton next asserts that the trial court erred when it entered summary judgment in favor of Ousley on the claim that he tortiously interfered with Melton's contractual business relationship with Country Oaks.[9] Ousley contends in part that his alleged interference was justified. We find this issue to be dispositive.

■■■ The elements of an action for tortious interference with a contract are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach. *Levee v. Beeching*, 729 N.E.2d 215, 221 (Ind.Ct.App.2000). All of the elements must be shown to establish this tort. *See*

*id.* A claim for tortious interference with an employment relationship can be maintained upon a contract terminable at will. *Bradley v. Hall*, 720 N.E.2d 747, 751 (Ind. Ct.App.1999) (citing *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 284 (Ind.1991)).

As discussed above, Melton listed several occasions in which Ousley expressed his opinion to others that Melton was not abiding by PGA rules by holding himself out as an A–6 classification. But in his brief on appeal he does not allege that any of the statements made to other golf professionals or in the Dellinger letter impacted his relationship with Country Oaks. Instead, he contends only that "Ousley encouraged the Indiana Section to investigate whether Melton's employment at Country Oaks satisfied the A–6 classification criteria." Appellant's Brief at 23. Thus, our review is limited to Ousley's phone call and letter to Michael David, the Executive Director of the Indiana Section and, as Ousley contends, whether those statements were justified.[10]

■ In determining whether an intentional interference is justified, the Restatement suggests that the following factors be considered:

---

8. Although we hold that the Dellinger letter was not published and, therefore, cannot form the basis of a defamation claim here, we observe that the letter is harsh, if not unprofessional.

9. Melton's complaint does not specify whether he is asserting a claim of tortious interference with a business relationship or tortious interference with a contractual relationship. The elements of the two claims are the same with the following exceptions: (1) the first does not require a showing of the existence of a valid contract; and (2) the second does not require a showing of illegality. *Furno v. Citizens Ins. Co.*, 590 N.E.2d 1137, 1140 (Ind.Ct. App.1992), *trans. denied.* Melton first clari-

fied that his complaint alleged a claim for tortious interference with a contractual employment relationship in his brief in opposition to Ousley's motion for summary judgment. Because we consider Melton's claim to be for tortuous interference with a contractual relationship, we do not consider arguments regarding the propriety of the trial court's findings as to the other tort or illegality.

10. Because we deem the element of justification to be dispositive, we do not consider the other elements of the tort or the trial court's finding that there was no evidence of interference by Ousley.

(a) the nature of the defendant's conduct;

(b) the defendant's motive;

(c) the interests of the plaintiff with which the defendant's conduct interferes;

(d) the interests sought to be advanced by the defendant;

(e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;

(f) the proximity or remoteness of the defendant's conduct to the interference; and

(g) the relations between the parties.

*Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 970 (Ind.Ct.App.2001) (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind.1994) (citing Restatement (Second) of Torts § 767 (1977))).

▮ The weight to be given each consideration may differ from case to case, but the overriding question is whether the defendant's conduct has been fair and reasonable under the circumstances. *Bilimoria Computer Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 156 (Ind.Ct.App. 2005). This element is established only if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another. *Id.* (citations omitted). The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability. *Id.* (citation omitted).

The evidence designated by Ousley shows that Ousley telephoned David and explained that he did not believe Melton was eligibly employed to be classified as an A–6. At David's request, Ousley then forwarded his concerns to David in writing. In his deposition, David stated that the Indiana Section follows a procedure when it receives such a complaint or concern. Specifically, and as was done in this case, if the Section believes that the question or concern is legitimate, then the Section will contact the "National office" for a "standard letter ... asking for various information from the individual to substantiate that, yes, [he] is qualified correctly." Appellant's App. at 159. That process was followed in this case. Upon review of the information provided with Melton's response, the Indiana Section determined that Melton was indeed not eligibly employed to be classified as an A–6. Melton appealed, and the PGA Board of Control and Board of Directors both upheld the Section's determination. Melton was first found to have employment satisfying the A–6 classification in December 2008.

The undisputed evidence shows that the Indiana Section has a process for addressing member concerns about the proper classification of another member. With such a procedure in place, Melton cannot reasonably argue that one member of the Section may not allege to the organization such a violation by another member. In his appellant's brief, Melton asserts only that Ousley "encouraged" the Indiana Section to investigate whether Melton's employment qualified him as an A–6. Appellant's Brief at 23. He does not address whether Ousley's complaints to David were justified, only whether they in fact interfered with his employment with Country Oaks. Such is not sufficient to show a genuine issue of material fact regarding whether Ousley's complaint to the Section was justified.

In his Reply Brief, Melton briefly addressed Ousley's claim that his comments to David were justified. But Melton did not address that element of the tort in his appellant's brief. As such, his argument regarding justification is waived. *See* Ind. Appellate Rule 46(C). Waiver notwith-

standing, Melton argues in his reply brief only that Ousley's "justification for his actions was primarily financial[.]" Reply Brief at 20. Melton does not address at all the facts that the Indiana Section and the PGA have procedures in place to deal with complaints that a member may be holding himself out as an improper classification.

Ousley has demonstrated evidence showing a justification for his complaints to David regarding Melton, namely, that there is a procedure in place for an Indiana Section member to request the organization to investigate whether another member is qualified for the PGA classification he holds. In other words, Ousley has shown by undisputed evidence that his communications to David regarding Melton had a legitimate business purpose. *See Bilimoria,* 829 N.E.2d at 156. And Melton has not demonstrated a genuine issue of material fact regarding that justification. Although the trial court's summary judgment order did not address justification, again, we may affirm a summary judgment ruling if it is sustainable on any legal theory or basis found in the evidentiary matter designated to the trial court. *Tony,* 918 N.E.2d at 367. Melton has not shown that the trial court erred when it granted summary judgment in favor of Ousley on the claim of tortuous interference with a contractual business relationship.

Affirmed.

FRIEDLANDER, J., and BRADFORD, J., concur.