# FOR PUBLICATION



**FILED**
Aug 14 2012, 8:57 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ROBERT M. HAMLETT**
Frank & Kraft
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**THOMAS W. VANDER LUITGAREN**
**BRANDI R. FOSTER**
Van Valer Law Firm
Greenwood, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| HAROLD O. FULP, JR., | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 41A01-1111-TR-530 |
| | ) | |
| NANCY A. GILLILAND, Individually and as | ) | |
| Successor Trustee of the Ruth E. Fulp | ) | |
| Revocable Trust Dated June 29, 2005, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE JOHNSON SUPERIOR COURT
The Honorable Kevin M. Barton, Judge
Cause No. 41D01-1011-TR-299

**August 14, 2012**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Plaintiff, Harold O. Fulp, Jr. (Harold), appeals the trial court's denial of his request for specific performance of a purchase agreement which he entered into with Ruth E. Fulp (Ruth) and which was rescinded by Appellee-Defendant, Nancy A. Gilliland (Gilliland), Individually and as Successor Trustee of the Ruth E. Fulp Revocable Trust.

We affirm in part and reverse in part.

## ISSUES

Harold raises five issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether Ruth, as the settlor, trustee, and sole lifetime beneficiary of the Ruth E. Fulp Revocable Trust, could properly execute a purchase agreement for the sale of the Trust property, thereby divesting the Trust; and

(2) Whether the trial court erred by determining that Gilliland did not tortiously interfere with the purchase agreement when she rescinded the agreement upon becoming successor trustee.

## FACTS AND PROCEDURAL HISTORY

Ruth was married to Harold O. Fulp, Sr. (Fulp). During their marriage, three children were born: Harold, Terry Fulp (Terry), and Gilliland. The family resided at the family farm, which consisted of approximately 254.66 acres and was located in Franklin,

2

Indiana. After Fulp's death in 1990, Harold farmed the land on a cash rent basis. On May 19, 2004, Ruth sold fifty acres, consisting mostly of woodland, to Gilliland's daughter for $110,000.

On June 29, 2005, Ruth executed the Ruth E. Fulp Revocable Trust (the Trust), designating herself as the settlor, trustee, and sole lifetime beneficiary and incorporating the family farm as the main Trust corpus by quitclaim deed. Ruth's three children were named as remainder beneficiaries. Article I of the Trust provided, in pertinent part, that "the settlor shall have the right to alter, amend or revoke this agreement in any respect or particular." (Appellant's App. p. 40).

Following the execution of the Trust and due to her advancing age and infirmity, Ruth moved to the Indiana Masonic Home in Franklin, Indiana, where she resides to this day. Of Ruth's three children, Harold was the only child interested in farming the family farm. Because Ruth wanted the farm to remain in the family, Gilliland encouraged Ruth to ask Harold about his interest in purchasing the real estate. In August 2010, while Harold visited Ruth in the nursing home, Ruth approached Harold about buying the farm. Harold indicated that he was interested if he could obtain a loan to do so. On a next visit, Harold presented his mother with a piece of paper showing a scenario of sale price options, reflecting a total sale price from four thousand dollars per acre down in one hundred dollar increments to one thousand five hundred dollars per acre. Arriving at a price of two thousand two hundred dollars per acre, Harold mentioned to Ruth that this was the sale price she had given to her granddaughter in 2004. Harold suggested that the

3

same price per acre be used for his transaction. Ruth responded, "I guess I could" sell the farm for that price. (Transcript p. 21). Harold told his mother, "well, mom, I know the ground's worth more than that, but, [], it's up to you." (Tr. p. 70). Harold testified that his mother stated "What I done for one, I can do for another." (Tr. p. 70).

On September 7, 2010, Harold again visited his mother presenting her with a Purchase Offer Agreement to sell the farm for a total purchase price of $450,252. Even though Ruth could not read the form without her glasses, she signed the sales agreement in front of two witnesses. After signing the agreement, Ruth contacted Gilliland and advised her of the transaction. Approximately two weeks later, on September 21, 2010, Ruth resigned as trustee and Gilliland assumed the role of successor trustee of the Trust. The following day, September 22, 2010, Jack Rogers (attorney Rogers), Ruth's attorney, advised Ruth's three children that

> [y]our mother, [], is distressed about the fair market value of her farm. She wishes to treat all three of you equally after she passes on, but in the meanwhile, she wishes to have the financial resources to pay her own way at the Masonic Home while she is alive. She has a line of credit at Mutual Savings Bank based on the bank's appraisal of the value of her farm. This appraised value is approximately $900,000.00. Any sale of the farm for less than this value will result in a gift tax issue that the U.S. Congress has yet to resolve.
>
> In any event, your mother is not able to emotionally handle the Fulp Family's diversity of interests and objectives. For this reason she has resigned as the Trustee of her revocable trust and has turned the trusteeship over to [Gilliland] with Ruth's brother, Robert, as the backup trustee, both of whom are interested in your mother's care and comfort during her lifetime.

(Appellant's App. p. 320).

4

On October 8, 2010, Harold's attorney wrote to Ruth, informing her that Harold had arranged financing to buy the family farm in accordance with the Purchase Offer Agreement and requesting permission to set a closing date. Four days later, on October 12, 2010, attorney Rogers responded

> I am sorry to report that [Ruth] is not mentally competent to manage her financial affairs and she is in fact no longer in control of the real estate you reference. There will be no real estate closing in the near future. In fact, [Ruth] does not have a copy of any agreement to sell any land, nor does she know the terms of the sale you reference. This is not unusual for a 91 year old person confined to a long-term care facility where trained staff is well aware of the mental health of each of their patients.

(Appellant's App. p. 57). Thereafter, Gilliland repudiated the Purchase Offer Agreement.

On November 22, 2010, Harold filed his Complaint seeking the docketing of the Trust, the removal of Gilliland as trustee, specific performance of the Purchase Offer Agreement, and bringing a claim for tortious interference with a contract. On April 12, 2011, Gilliland filed a counterclaim against Harold, alleging tortious interference with an inheritance. On April 30, 2011, the trial court granted Harold's motion to dismiss Gilliland's counterclaim. On July 27, 2011, the trial court conducted a bench trial. Thereafter, on October 27, 2011, the trial court entered a detailed Order and Judgment, comprised of twenty pages and one hundred and nine findings, concluding, in pertinent part, that

> 57. The consideration for the sale was approximately one-half of the known bank appraisal at the time, []. [Gilliland] argues from this disparity that the transaction was the result of either mental incapacity by [Ruth] or undue influence by [Harold]. However, a family dynamic is also present. In establishing the sales price of the farm, [Harold] confronted his mother

5

with the fact that she had previously sold acreage for an amount less than the appraised value of the acreage. This placed [Ruth] in the position of either accepting the price established in a prior transaction on the principle that she would treat her son and her granddaughter the same or she would have to demand a higher price, presumably based on fair market value, and thus implicitly state to her son that she had previously allowed her granddaughter to benefit from a transaction with a reduced per acre sales price but she would now apply different terms of sale. She elected the former at the time. The decision is logical from the standpoint that she is not showing favoritism as to the family members to whom she has sold farm acreage, and the decision permits the farm to remain in the family.

58. From a consideration of all factors, the court is unable to determine that the sale of the farm for an amount less than the appraised value of the farm establishes any mental incapacity of [Ruth]. The [c]ourt must conclude the contrary from the evidence presented, [Ruth] was mentally competent and made a rationale decision.

* * *

66. The [c]ourt is unable to find undue influence. As noted above, the price that was established was a sensible decision based upon the family relationships and past history. Essentially, under the circumstances, [Harold] "pitched" that the prior price established in the sale to the granddaughter was a fair price, and [Ruth] agreed. This is not undue influence. The court also notes that the Purchase Offer Agreement was witnessed by two employees of the Indiana Masonic Home. One of the employees was described as a nurse. The testimony was that the agreement was signed at the nurse's station. Although neither party called either witness to testify, the [c]ourt is aware from prior experience that employees in hospitals, nursing homes and assisted living facilities are particularly cautious in serving as witnesses. Here, the employees only signed as witnesses and without being asked to certify any particular facts. However, the [c]ourt may conclude that the execution of the Purchase Offer Agreement occurred in front of other individuals, and the circumstances of the situation did not raise any particular concern to those individuals acting as witnesses from serving as witnesses. The [c]ourt does not find that undue influence has been established.

* * *

6

101. Here [Harold] seeks specific performance in equity of the contract that he procured by breach of the fiduciary duty that he as a beneficiary owed to the Trust and beneficiaries entering into a contract with the [t]rustee by which the [t]rustee breached her fiduciary duties by selling trust property for less than the fair market value of the property.

102. For the [c]ourt to enforce the contract in equity would be to condone a beneficiary's breach of fiduciary duty and a violation of Indiana Code [section] 30-4-3-20. While [Ruth], in her capacity as a beneficiary, may be equally culpable with the remainder beneficiary, [Harold], in the commission of a breach of fiduciary duty, both [Ruth], as [t]rustee, and [Harold], as remainder beneficiary, owed a fiduciary duty to the other remainder beneficiaries. The [c]ourt accordingly concludes that the action by [Harold] for specific performance is barred under the "unclean hands" doctrine and the unwillingness of equity to condone a breach of trust by specific enforcement of the contract.

103. Accordingly, the [c]ourt declines to award [Harold] specific performance under Count III of his petition.

104. The [c]ourt turns to the Petition for Removal of Trustee. The [c]ourt has found that [Ruth] was not mentally incompetent at the time that she resigned as [t]rustee. Indeed, [Harold] acknowledges that [Ruth] was mentally competent to sign the Purchase Offer Agreement on September 7, 2010, which was only fifteen (15) days prior to her resignation of trustee. The [c]ourt found no evidence that [Gilliland] exercised undue influence in causing [Ruth] to resign. Robert Campbell, [Ruth's] brother, was very clear that the decision of [Ruth] to resign was her voluntary act. [Ruth] was also clear that it was her decision alone to resign as [t]rustee. While the relationship of [Gilliland] as Attorney In Fact and as the care provider for [Ruth] would give rise to the presumption of undue influence, the presumption is rebutted by the evidence from Robert Campbell and [Ruth]. [Harold] presents no evidence to establish undue influence other than is created by the presumption.

105. The [c]ourt denies the Petition of [Harold] for the removal of [Gilliland] as [s]uccessor [t]rustee under Count II of his Petition.

* * *

7

107. [] [T]he [c]ourt holds in favor of [Gilliland] and against [Harold] on the [c]omplaint for [t]ortious [i]nterference [w]ith [c]ontract.

108. The [c]ourt therefore finds that [Harold] takes nothing by his Petition. Judgment is entered in favor of the [Trust] and [Gilliland] and against [Harold].

(Appellant's App. pp. 17-18, 19-20, 27-28).

Harold now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Standard of Review*

Where, as here, the trial court enters findings and conclusions *sua sponte*, we apply the standard of review set out in Indiana Trial Rule 52. *Chidester v. City of Hobart*, 631 N.E.2d 908, 909 (Ind. 1994). We determine whether the evidence supports the findings and the findings support the judgment. *Bowyer v. Ind. Dep't of Natural Res*., 944 N.E.2d 972, 983 (Ind. Ct. App. 2011). In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Id*. We do not reweigh the evidence, but only consider the evidence favorable to the trial court's judgment. *Id*.

While we review findings of fact under the clearly erroneous standard, we review *de novo* a trial court's conclusions of law. *Id*. Where cases present mixed issues of fact and law, we have described the review as applying an abuse of discretion standard. *Id*. We will conclude a judgment is clearly erroneous if no evidence supports the findings, the findings fail to support the judgment, or if the trial court applies the incorrect legal

8

standard. *Id*. at 983-84. In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id*. However, *sua sponte* findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. *Tracy v. Morell*, 948 N.E.2d 855, 862 (Ind. Ct. App. 2011). A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id*.

## II. *The Trust*

In framing his argument that the trial court erred when it concluded that he is not entitled to the equitable remedy of specific performance of the Purchase Offer Agreement, Harold focuses on Ruth's status as settlor of the Trust. He contends that based on the provisions of the Trust, Ruth, as settlor, reserved a right to revoke and amend the Trust as she saw fit. This reserved right necessarily included a right to sell part of the Trust corpus, which was properly exercised by Ruth when she entered into the Purchase Offer Agreement. In response, Gilliland, like the trial court, concentrates her argument on Ruth's capacity as trustee, maintaining that as trustee, Ruth was required to administer the Trust solely in the interest of the beneficiaries and preserve the Trust's property. Having failed to do that, Ruth breached her fiduciary duties with Harold's aid by selling the farm significantly below fair market value. As such, Gilliland—and the trial court—conclude that Harold, having unclean hands by encouraging Ruth to breach her fiduciary duty, is not entitled to specific performance.

9

Evaluating the parties' respective arguments requires us to interpret and construct the Trust instrument. The interpretation of a trust is a question of law for the court. *Paloutzian v. Taggart*, 931 N.E.2d 921, 925 (Ind. Ct. App. 2010). The primary purpose of the court in construing a trust instrument is to ascertain and give effect to the settlor's intention and carry out this intention unless it is in violation of some positive rule of law or against public policy. *Id.* This court is not at liberty to rewrite the trust agreement any more than it is at liberty to rewrite contracts. *Id.* When a trust instrument must be construed by a court, we attempt to discern the settlor's intent in light of the facts and circumstances existing at the time the instrument was created. *Id.*

A trust is "a fiduciary relationship between a person who, as trustee holds title to property and another person for whom, as beneficiary, the title is held." Ind. Code § 30-4-1-1(a). The trust is a peculiar product of the Anglo-American system. The principles, rules and standards of the law of Trusts owe their origin and development in large part to the circumstance that England had for centuries separate courts of common law and chancery, to which is due the distinction between legal interests and equitable interests which is the basis for the law of Trusts. RESTATEMENT (SECOND) OF TRUSTS, intro. note (1959).

Within the area of trusts, the inter vivos or revocable trust is a unique legal entity. Through its use, the settlor may transfer property to a trustee, reserving the beneficial use of the property for the life of the settlor with the remainder to designated beneficiaries. *In the Matter of Walz*, 423 N.E.2d 729, 732 (Ind. Ct. App. 1981). Although the settlor

enjoys the beneficial use of the trust property until his death, trust property is not subject to the administration of his estate. *Id.* Where, as here, a settlor transfers, assigns and sets over to a trustee title to property owned by him in a proceeding to create a trust inter vivos, the interest therein passes immediately to the trustee, and the trust is consummated even though the trust instrument reserves to the settlor the income for life, an absolute power to revoke the trust in whole or in part and the right to control investments and further to modify the trust in any respect. *Id.* (quoting *Smyth v. Cleveland Trust Co.*, 179 N.E.2d 60 (Ohio 1961)). With respect to the settlor's power to revoke, Indiana's Trust Code reads, in pertinent part, as follows:

> (c) The settlor may revoke or amend a revocable trust as follows:
> (1) The settlor may comply with a method provided in the terms of the trust.
> (2) If the terms of the trust do not provide a method or the terms of the trust provide a method that is not expressly made the exclusive method to revoke or amend the trust, the settlor may revoke or amend the trust by:
> (A) executing a will or codicil that:
> (i) expressly refers to the trust; or
> (ii) specifically devises property that would otherwise have passed according to the terms of the trust; or
> (B) any other method that:
> (i) is in writing; and
> (ii) manifests clear and convincing evidence of the settlor's intent.

I.C. § 30-4-3-1.5(c).

Once the settlor delivers property to a trustee by virtue of a trust agreement, the trustee takes the legal title to the property and the *cestui* trust or beneficiary takes the equitable title. *Breeze v. Breeze*, 428 N.E.2d 286, 287 (Ind. Ct. App. 1981). Both have a

11

property interest recognized by law. *Id.* Where the trust provides that the trustee shall hold and manage the property and pay the income derived therefrom and a part of all of the corpus in its discretion to one beneficiary for life and the remainder, if any, to a remainder beneficiary upon the death of the first beneficiary, both the first beneficiary and the remainder beneficiary, upon the activation of the trust, acquire an interest and one that can be assigned by either beneficiary. *Id.* at 287-88.

Here, Ruth settled the revocable trust, transferred property into the Trust, designated herself as trustee, and became the beneficiary for life of the Trust corpus. The Trust instrument specified that upon Ruth's death, the Trust shall become irrevocable with the remainder of the corpus to be dispensed between the remainder beneficiaries, *i.e.*, her three children. In its Order, the trial court focused on Ruth's capacity as trustee, as well as her corresponding fiduciary duty to manage the Trust and safeguard its trust corpus. However, first and foremost, Ruth is the settlor of the trust—without her transfer of property, the Trust could not be settled.

Although the question of whether an individual who combines the positions of settlor of a revocable trust, trustee, and beneficiary for life should be considered the settlor or trustee for purposes of a property transfer out of the Trust has not been examined in Indiana, the trial court in its Order relied on *Marshall & Ilsley Trust Co. v. Woodward*, 848 N.E.2d 1175 (Ind. Ct. App. 2006). However, we find *Marshall* to be inapposite as it analyzes whether a named remote contingent beneficiary of an irrevocable trust is entitled to an accounting. *See id.* at 1178.

12

Closer related to the current circumstances than the *Marshall* case, is our recent opinion of *Kesling v. Kesling*, 967 N.E.2d 66, 79 (Ind. Ct. App. 2012), in which we examined if a settlor, who placed shares of stock into a revocable inter vivos trust and named himself as trustee and beneficiary retained his shareholder status. Analyzing the legal status of a revocable trust in Indiana, we noted the Internal Revenue Code's treatment of a revocable trust whereby settlors with the ability to control the assets of their revocable trust possess an ownership interest and bear the tax consequences. *See id*. at 85. Combining the IRS view with the trust declaration's provision that the settlor could revoke the trust at any time, we concluded in *Kesling* that the placement of the shares in a trust did not eliminate the settlor's shareholder's status. *Id*. at 86.

In *Moon v. Lesikar*, 230 S.W.3d 800 (Tex. Ct. App. 2007), the Texas appellate court was faced with a beneficiary of a revocable trust bringing an action against the trustee for breach of fiduciary duty in order to challenge the sale of stock by the settlor to the trustee prior to the settlor's death. In her concurring opinion, Justice Guzman analyzed the respective rights and duties of a settlor and trustee. She persuasively noted as follows:

> [The trust] reserved to the settlor the power to modify or revoke the trust, in whole or in part, and Carolyn, [the beneficiary], did not argue that [the settlor's] decision [to sell stock to the trustee] was the result of coercion, undue influence, lack of capacity, or was otherwise involuntary. To the contrary, Carolyn essentially complains that [the trustee] violated his fiduciary duty to her by failing to influence [the settlor] to abandon his intent to transfer the [stock] to him. She contends that, as a trustee, [the trustee] has a fiduciary duty to the contingent beneficiaries, and must therefore prevent the co-trustee from removing property from the trust or

13

transferring former trust property to him. In effect, she argues that, in his capacity as a trustee, [the trustee's] duty to her as a contingent beneficiary trumps his duty to fulfill the expressed intent of the settlor.

But this argument elevates the rights of a beneficiary above the rights of the settlor. Here, the settlor is also a trustee; thus, under the fiduciary duties that Carolyn suggests, the settlor would share the same duty to prevent the removal of the trust property. Thus, the settlor could revoke the trust only by breaching his duty to every beneficiary, contingent beneficiary, and remainderman who held an interest, however attenuated, in the trust property. Under this interpretation, the trust would no longer be freely revocable. Because a fiduciary must also place the interests of the one to whom a duty is owed above his own interests, it would seem that the settlor, in his capacity as trustee, would have a duty to prevent himself, in his capacity as settlor, from revoking the trust. This result is inconsistent with the Trust Code and the terms of the trust documents.

*Id*. at 809 (internal references omitted).

In the case before us, Ruth, as settlor, retained the right to alter, amend or revoke the Trust in any respect. At the time of its creation, Ruth intended the Trust to provide her with a lifelong beneficiary income. To that end, she transferred, among others, the family farm into the Trust corpus. Following the execution of the Trust and facing advanced age, Ruth expressed a desire to keep the farm in the family. After talking with Harold, she entered into a Purchase Offer Agreement with him and sold him the family farm. Thereafter, Ruth resigned as trustee; Gilliland became the successor-trustee and rescinded the Purchase Offer Agreement.

Pursuant to the terms of the Trust, Ruth, as settlor, entered into a valid agreement with Harold, selling part of the Trust's corpus and thus, in effect partially amending the Trust. Holding otherwise and viewing Ruth as trustee would make the Trust in effect

14

irrevocable as she would no longer be free to control her assets but instead would owe a duty to the beneficiaries which would trump her own interest as settlor and owner of the Trust corpus. Absent a finding of undue influence or mental incapacity—which Gilliland does not allege, nor did the trial court find any—Ruth entered into a valid agreement and Harold is entitled to specific performance of the Purchase Offer Agreement.[1]

### III. *Tortious Interference With A Contractual Relationship*

Next, Harold contends that the trial court erred when it concluded that Gilliland had not tortiously interfered with the Purchase Offer Agreement when she repudiated the agreement upon becoming the successor-trustee of the Trust.

The elements constituting an action for tortious interference with a contract are well-established: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducements of breach of the contract; (4) the absence of justification; and (5) damages resulting from

---

[1] In her appellate brief, Gilliland raises several claims, encouraging us to find that "Harold's specific performance claim would be unfair, harsh, oppressive, unconscionable, inequitable and would result in an unfair and unjust gain and enrichment to Harold and omitted valuable consideration." (Appellee's Br. p. 30). Even though Gilliland pled these affirmative defenses in her answer to the Complaint, none of these were presented to the trial court during the trial. Moreover, although she asserts these equitable allegations, she does not appear to contest the trial court's findings that Ruth's decision in pricing the farm as she did was "logical," "rational," and "sensible" based on the family dynamic and history. (Appellant's App. pp. 17-19). Therefore, we refuse to disturb the trial court's findings. Furthermore, Gilliland's argument that "[i]t can reasonably be inferred that, after the sale to her son, she will have no assets with which to support herself after a mere five year if you assume her basic living costs [of] approximate Eight Thousand Dollars ($8,000.00) per month" is not supported by any evidence in the record besides Gilliland's testimony at trial. (Appellee's Br. p. 31). With respect to Gilliland's claim that Harold failed to act in good faith by not encouraging Ruth to discuss the sale with Gilliland, we note that Ruth initiated the transaction at Gilliland's advice and Harold visited three times to complete the transaction during August and September of 2010, presenting Ruth with a range of sale prices. It is clear that Gilliland must have been aware about ongoing conversations between Ruth and Harold.

15

defendant's wrongful inducement of the breach. *Melton v. Ousley*, 925 N.E.2d 430 (Ind. Ct. App. 2010). All of these elements must be shown to establish this tort. *Id.*

On September 7, 2010, Ruth, as settlor of the Trust, and Harold entered into the valid Purchase Offer Agreement to sell the farm. On September 22, 2010, attorney Rogers notified Ruth's children that Ruth had voluntarily resigned as trustee and Gilliland had been appointed successor-trustee. Thereafter, on October 12, 2010, Rogers informed Harold's counsel that "there will be no real estate closing" and Gilliland repudiated the Purchase Offer Agreement. (Appellant's App. p. 57).

The main contention of the parties turns on the absence of justification. Harold claims that "[t]here was never any question, or reason to dispute, that [Gilliland's] repudiation of the Agreement after she became [s]uccessor [t]rustee was motivated by her intention to maximize her potential inheritance under the Trust, and for no other reason." (Appellant's Br. p. 17). Gilliland, on the other hand, contends that she was concerned about the legality of the transaction, as it depleted the Trust corpus.

In determining whether an intentional interference is justified, the following factors may be considered: (a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties. *Dietz v. Finlay Jewelry Corp.*, 754 N.E.2d 958, 970 (Ind.

16

Ct. App. 2001). The weight to be given each consideration may differ from case to case, but the overriding question is whether the defendant's conduct has been fair and reasonable under the circumstances. *Bilimoria Computer Sys., LLC v. Am. Online, Inc*., 829 N.E.2d 150, 156 (Ind. Ct. App. 2005). This element of absence of justification is established only if the interferer acted intentionally, without legitimate business purpose and the breach is malicious and exclusively directed to the injury and damage of another. *See id*. The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability. *Id.*

Pursuant to the Trust instrument, the trustee has the duty to administer the Trust solely in the interest of the beneficiaries and to preserve the Trust property. Being confronted with a Purchase Offer Agreement that depleted the Trust corpus and sold the farm below fair market value, Gilliland, as successor trustee, had a legitimate and reasonable reason to repudiate the agreement. Therefore, we conclude that she did not tortiously interfere in the contractual relationship between Ruth and Harold.

## CONCLUSION

Based on the foregoing, we conclude that Ruth, as the settlor, of the Trust could properly execute a purchase agreement for the sale of the Trust property and Gilliland did not tortiously interfere with the purchase agreement when she rescinded the purchase agreement upon becoming successor trustee.

Affirmed in part and reversed in part.

BAILEY, J. and CRONE, J. concur

17