**Larry BOWYER d/b/a Lakes Limited Liability Corp., Appellant–Defendant,**

v.

**INDIANA DEPARTMENT OF NATURAL RESOURCES, Appellee–Plaintiff.**

No. 09A05–0912–CV–740.

Court of Appeals of Indiana.

March 21, 2011.

Rehearing Denied May 20, 2011.

Robert Leirer Justice, Logansport, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

■ Larry Bowyer d/b/a Lakes Limited Liability Corp. ("Bowyer") appeals the trial court's grant of a permanent injunction and damages in favor of the Indiana Department of Natural Resources (the "DNR"). Bowyer raises four issues, which we consolidate, revise, and restate as whether the trial court's Amended Findings of Fact, Conclusions of Law and Judgment granting the DNR's complaint for a permanent mandatory injunction and damages was clearly erroneous. We affirm.[1]

This case was initiated when the DNR filed its complaint on January 13, 2000 and has produced three published opinions as well as one opinion on rehearing from this

court. On this score, both at the trial level at a hearing on November 13, 2008, as well as in this instant appeal, Bowyer has either attempted to relitigate issues which have already been decided, or at least to narrow the impact of the previous decisions, with the hope that we might read this court's previous opinions in a light more sympathetic to Bowyer's interests. Moreover, Bowyer states in his brief that he "has fought hard but he has fought fair, and he only asks that this court treat him fairly and give this case one more honest review." Appellant's Brief at 8. However, as will be thoroughly examined below, there are points in Bowyer's briefs where he has mischaracterized both the record and the applicable law.

### Facts and Case History[2]

At some point in 1997, Bowyer entered into a contract with Karen and Marion Garling to purchase a private campground located on the southern shore of Lake Cicott in Cass County.[3] On June 7, 1999,

1. Bowyer also raises the issue that:
 [T]he Trial Court's Order that [he] 'restore Lake Cicott back to its natural condition or as close as can [sic] possible' ... signifies that [he] is required, if [DNR] is so inclined, to correct all modifications of the shoreline and depth of the lake since man first came to it, including removal of U.S. Highway 24 and railroad right-of-way.
 Appellant's Brief at 12. We agree with the DNR's assertion that the court's order, discussed below, "is not a demand that [he] remove the highway and the railroad—rather it is a demand that [he] cooperate with the [DNR] in removing the fill and restoring the areas he altered." Appellee's Brief at 14.
 Also, Bowyer in his reply brief appears to raise the issue that some of the areas covered in the injunction are situated "above the legal lake level and thus not on the shoreline," and thus the court did not have the authority to order Bowyer to remediate those areas. Appellant's Reply Brief at 10. Because Bowyer makes this argument for the first time in his reply brief, he has waived this argument. See Weldon v. Asset Acceptance, LLC, 896 N.E.2d

1181, 1186 (Ind.Ct.App.2008), trans. denied; see also Ind. Appellate Rule 46(C).

2. We note that Bowyer's Statement of Facts in his appellant's brief contains argument. We remind Bowyer that the Statement of Facts should be devoid of argument. Ramsey v. Review Bd. of Ind. Dep't of Workforce Dev., 789 N.E.2d 486, 488 (Ind.Ct.App.2003).

3. Bowyer has maintained throughout the litigation that he contracted to purchase not only the campground from the Garlings, but also Lake Cicott itself. Bowyer has repeatedly stated that the Garlings have historically paid taxes on the lake. The record, including the parts cited by Bowyer for this proposition, demonstrates that these contentions are debatable. We note that the purchase contract itself is not included in the record. Also, Bowyer directs our attention to the trial court's December 11, 2000 Findings of Fact as support for the proposition that the Garlings owned Lake Cicott and paid taxes on the lake. The relevant findings, however, state that "in 1998, the Garlings sold the camp-

the DNR sent a letter to Bowyer which stated in part:

Dear Mr. Bowyer:

Based on a site inspection on May 5, 1999, it appears that you have placed fill in Lake Cicott. The site is located . . . near Logansport, Jefferson Township, Cass County.

The Lake Preservation Act (IC 14–26–2) charges the [DNR] with the responsibility of regulating all construction on Indiana's public freshwater lakes. Accordingly, the Division of Water administers and coordinates the permitting process for those proposed projects that occur at or lakeward of the legal established shoreline.

Your project appears to lie at or lakeward of the legal shoreline of Lake Cicott. A search of our files indicates that a permit from the [DNR] has not been granted for this project. **There is to be *no* further construction at the site until this matter is resolved.**

Restoration of the site will be a part of the resolution of this problem, since the filling in a public freshwater lake is not permitted under the Lake Preservation Act. The restoration plan and time schedule *must* be coordinated with Division of Water staff to assure satisfactory results.

Unpermitted activities on public freshwater lakes constitute a Class C infraction. . . . [4]

Appellant's Appendix at 32–33.

In November and December, 1999, John Hall, a Field Inspector for the Violations and Compliance Section of the DNR, visited Lake Cicott to conduct inspections. Hall observed that "[w]ork was going on along the south side of the lake along the west edge of . . . the campground," as well as "on the island just to the north of the campground." Transcript at 33. At that time, the actual waterline of Lake Cicott was "four to five feet below the outlet culvert on the east side of the lake near the Methodist church," and Hall observed the island as "a low area that you could see was just above the existing water level at the time." *Id.* at 33–34. Previous DNR

---

ground to [ ] Bowyer. The legal description on the deed includes a portion of the lake bed up to the low water mark on the north shore of Lake Cicott. However, Mr. Garling testified that they 'did not sell the water' to Mr. Bowyer." Appellant's Appendix at 146. In any event, this court's 2001 opinion makes it clear that Lake Cicott is a public freshwater lake and has enjoyed that status "since as far back as 1948. . . ." *Garling v. Ind. Dep't of Natural Res.*, 756 N.E.2d 1029, 1033 (Ind.Ct. App.2001), *clarified on reh'g*, 766 N.E.2d 409 (Ind.Ct.App.2002), *trans. denied.*

4. Both at the trial level and in Bowyer's reply brief, Bowyer contends that the "letter was not addressed properly [wrong zip code], and Bowyer testified he had no recollection of receiving it." Appellant's Reply Brief at 8. At the hearing on November 13, 2008, Bowyer elicited testimony from a neighbor, Donald Miller, who testified that the correct zip code for Lake Cicott, Indiana, was 46947. The letter was addressed to the zip code 46942. At the hearing, Bowyer was asked by his counsel: "[I]f there's a letter addressed to Logansport, Indiana, 46942, would that be, would that be delivered to you? 46942 is the zip code for Lake Cicott, right?" Transcript at 174. Bowyer's answer to the question was "[y]eah." *Id.* In the trial court's Amended Findings of Fact, Conclusions of Law and Judgment dated nunc pro tunc September 14, 2009, the trial court found that "[o]n June 7, 1999, [DNR] sent a letter to Defendant Bowyer informing him that he was placing fill in a public freshwater lake and that a search of [DNR] files revealed that no permit had been obtained for the project. . . ." Appellant's Appendix at 18. The order also concluded that Bowyer "had notice that Lake Cicott was a public lake[.]" *Id.* at 22.

Bowyer also acknowledges that he received the letter as an attachment to the complaint which "was apparently served on him, because counsel . . . appeared for him on February 9, 2000. . . ." Appellant's Reply Brief at 8.

records have used the culvert as the "lake level indicator" or "reference point," and the lake's water level at this time was the lowest that Hall had observed. *Id.* at 35. When the lake's waterline reaches the culvert, the depth of the lake at its deepest point is approximately 702.22 feet. Hall also observed earth moving equipment at his inspection on December 16, 1999, which he photographed.

On January 13, 2000, the DNR filed a Verified Complaint for Permanent Mandatory Injunction and Damages against Bowyer and Karen Garling "to enjoin the illegal dumping of construction and other debris into Lake Cicott." *Garling v. Ind. Dep't of Natural Res.*, 756 N.E.2d 1029, 1030 (Ind.Ct.App.2001), *clarified on reh'g*, 766 N.E.2d 409 (Ind.Ct.App.2002) (*"Garling Rehearing"*), *trans. denied.* Soon after, as raised by Garling in her response, a threshold issue in the litigation arose which was whether Lake Cicott was a public or private lake.[5] *Id.* On December 11, 2000, the trial court issued its Findings of Fact, Conclusions of Law, and Order Declaring Lake Cicott a Public Lake, which was appealed to this court. The Order stated that "Lake Cicott is recognized to be and is hereby declared to be a public freshwater lake." Appellant's Appendix at 154.

On October 17, 2001, this court issued an opinion affirming the trial court.[6] *Garling*, 756 N.E.2d at 1033. In so holding, we noted that "[o]ver the last 50 years, the Indiana Department of Conservation, and thereafter the DNR, has consistently regulated Lake Cicott as a public freshwater lake." *Id.* at 1031. Some of the evidence leading to this conclusion included that "as far back as 1948, the predecessor to the DNR, the Department of Conservation, began receiving requests for permission to modify Lake Cicott," and that:

> [I]n 1974, eight of the riparian owners petitioned the DNR:
>
>> to take jurisdiction and control over the said Lake Cicott, in trust for the use of all its citizens and to oppose any person or entities owning lands bordering on such Lake who assert that they may have exclusive right to the use of the waters of said Lake Cicott or any part thereof, all as pursuant to the statutes of the State of Indiana pertaining thereto.
>
> .... Three years after the petition, correspondence, which the DNR filed with the Cass County Clerk, identified Lake Cicott as a "public freshwater lake and as such subject to this Department's jurisdiction." Moreover, the letter warned that Indiana statutory law requires the DNR to issue written approval prior to any alteration of the shoreline or bed of a public lake such as Lake Cicott.

*Id.* at 1031 (citations omitted).

In March of 2001, after the trial court had issued its order finding Lake Cicott to be a public freshwater lake but before the order had been affirmed on appeal, Hall accompanied staff of the Indiana Department of Environmental Management ("IDEM") and the U.S. Army Corps of Engineers on an inspection of Bowyer's property. Hall approached the island and

---

**5.** Garling raised a second issue which was "the status of the contract of sale between her and Bowyer." *Garling*, 756 N.E.2d at 1030. However, "[b]ecause the resolution of the second issue depended on the court's ruling on the first issue, Garling moved the trial court to bifurcate the proceedings. The trial court

granted Garling's motion...." *Id.* at 1030–1031.

**6.** We granted Garling's petition for rehearing and clarified that Garling was appealing from an adverse, rather than a negative, judgment. *Garling Rehearing*, 766 N.E.2d at 411.

observed "earthen fill placed on top ... approximately three to four feet deep on the southern half to two-thirds ..." that had not been present during his 1999 inspections. Transcript at 39–40. This fill was situated below the culvert reference point. Hall also observed that, "along the eastern side of the island," it appeared that excavation into the lake had occurred in which the fill was "placed on top of the island." *Id.* at 40–41.

"On March 28, 2001, because Bowyer was continuing to engage in construction activities in Lake Cicott's waters, DNR filed a 'Verified Motion for Automatic Temporary Restraining Order Without Notice.'" *Bowyer v. Ind. Dep't of Natural Res.*, 798 N.E.2d 912, 914 (Ind.Ct.App. 2003) (*"Bowyer I"*). "On March 30, 2001, without prior notice to Bowyer and without conducting a hearing, the trial court entered an 'Automatic Temporary Restraining Order Without Notice'" (the "TRO"), which ordered "Bowyer to cease 'any and all excavation/construction activities, of any nature whatsoever, below the shoreline of Lake Cicott, until this cause is fully determined.'" *Id.* Afterwards, in August 2001, the DNR examined "vegetation and soil on the north and east shores of the lake," and determined that the "shoreline" was located at 702.2 feet above sea level, and it placed temporary markers on the north and east shores. *Id.* at 915. At this time, "the actual water level of Lake Cicott was six to seven feet below the 702.2 foot level." *Id.*

In June 2002, DNR filed a motion to hold Bowyer in contempt for violating the TRO. *Id.* At a hearing in August 2002, DNR alleged Bowyer had performed work on his campground below the 702.2 foot level that it claimed was Lake Cicott's "shoreline," beginning in April 2001 and continuing through at least October 2001. *Id.* There was no evidence, however, that Bowyer had performed any work below the actual water line of Lake Cicott. *Id.* Instead, it appear[ed] to be undisputed that all of the work in question had taken place on land. *Id.* The trial court found Bowyer in contempt, and Bowyer appealed. *Id.*

Our opinion, dated November 21, 2003, began by observing that Ind.Code § 14–26–2–19(b),[7] the statute under which the DNR sought the TRO, appeared to be in direct conflict with Ind. Trial Rule 65(B), and afterwards examined the issue of whether the trial court abused its discretion in finding Bowyer in contempt. *Id.* at 916–918. We noted that a finding of contempt required "[w]illful disobedience of a lawfully entered order of which the offender had notice," that "[t]he order allegedly violated must have been so clear and certain that there could be no question as to what a party must do, or not do, and so there could be no question regarding when the order is violated," and that "[a] party may not be held in contempt for failing to comply with an ambiguous or indefinite order." *Id.* at 918 (quoting *Ind. High Sch. Athletic Ass'n, Inc. v. Martin*, 765 N.E.2d 1238, 1241 (Ind.2002), and *Martin v. Martin*, 771 N.E.2d 650, 654 (Ind.Ct.App. 2002)). Identifying the "crux" of the case as being that the TRO "fails to give any definition to the word 'shoreline,'" we reversed, concluding "that this render[ed] the TRO inherently ambiguous and highly indefinite." *Id.*

We cited to Ind.Code § 14–26–2–4 and, after noting that the shoreline had not been legally established, held that "when

---

7. Ind.Code § 14–26–2–19 was subsequently amended by Pub.L. No. 71–2004, § 4, and currently reads in its entirety: "The [DNR] may seek relief under IC 14–25.5–4 for the violation of this chapter."

DNR sought and obtained the TRO, it had not undertaken to find Lake Cicott's 'shoreline' under the two alternative definitions in subsection (2)," and that Bowyer could not be held in contempt for failing to comply with it. *Id.* at 919. We stated that "[i]t would appear that Bowyer took the phrase 'below the shoreline' to mean he could not work in Lake Cicott's waters, but that he could work around it," and that "[b]ecause of the vagueness of that order, the trial court abused its discretion in holding Bowyer in contempt for violating it." *Id.* at 919–920.

Soon after our decision in *Bowyer I*, on December 16, 2004, Bowyer and Garling filed a Joint Motion to Order Formal Determination of Average Water Level of Lake Cicott. On April 25, 2005, over the DNR's objection, the trial court ordered the DNR to file a report pursuant to Ind. Code § 14–26–4–3, which is necessary to make a formal determination of the average normal water level of Lake Cicott. *Bowyer v. Ind. Dep't of Natural Res.*, 882 N.E.2d 754, 755 (Ind.Ct.Ap.2008) (*"Bowyer II"*) On July 15, 2005, the DNR filed its Petition to Establish the Average Normal Water Level for Lake Cicott, attaching the DNR's report pursuant to the trial court's order. *Id.* The trial court held a hearing on the DNR's petition on March 23, 2006. *Id.* On August 28, 2006, after briefing, the trial court entered its Findings of Fact, Conclusions of Law and Judgment. *Id.* at 755–756. "The trial court entered judgment finding that the 'legal lake level for Lake Cicott ... pursuant to Ind.Code [Chapter] 14–26–4 is established at 702.22 feet NGVD'29.' " [8] *Id.* at 758.

Bowyer appealed the trial court's decision, contending that pursuant to Ind.Code Chapter 14–26–4, in order to establish a shoreline or water line "at least ten years' observation is required," and "that the trial court used an 'incorrect legal standard' when it based its determination of 'average normal water level' ... on water level measurements taken in a single day." *Id.* We issued an opinion dated March 20, 2008, which noted that Bowyer's argument misconstrued Ind.Code § 14–26–4–3, stating that "the plain language of the statute requires the report to contain *'data necessary to reveal and fix'* the highest elevation the water has risen in the past ten years." *Id.* at 761. We affirmed, holding that the trial court's procedures for determining the legal average lake level did not violate the statute. *Id.* We also held that the evidence was sufficient to find that the lake's legal average normal water level is 702.22 feet NGVD'29, noting that "the trial court found that Bowyer submitted no credible evidence that the water level should be something other than what the DNR determined...." *Id.* at 762.

### Present Appeal

On April 24, 2008, the DNR filed a Motion for Final Order. On November 13, 2008, the trial court held a hearing on the DNR's motion. Jim Hebenstreit, the DNR's Assistant Director of the Division of Water, testified that to date no permit had been issued by the DNR to Bowyer for his work at Lake Cicott. Also, Hall testified to facts consistent with the foregoing, and explained that, as of August or September of 2008, the island had a mobile home and a lighthouse on it, as well as "a bridge abutment that makes a bridge from the island to the shoreline on the south

8. *" 'NGVD'29' stands for The Nation Geodetic Vertical Datum of 1929, known after May 10, 1973, as the Sea Level Datum of 1929."* *Bowyer II*, 882 N.E.2d at 756 n. 1 (citing U.S. Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin., Nat'l Geodetic Survey, Frequently Asked Questions, http://geodesy.noaa.gov/faq.shtml# WhatVD29VD88 (last visited February 4, 2008)).

side of the lake." Transcript at 38. Hall testified that the fill which had been placed on the island was "below the lake level" of 702.22 feet NGVD′29. *Id.* at 42–43. Hall testified that over the last ten years he has inspected Lake Cicott on "close to fifty" occasions, that he had witnessed excavation work "[o]n the campground, along the south side of the lake and the west side of the campground . . .," and that some of the work was "below the lake level." *Id.* at 43–44. Hall indicated that "to get to the work that's higher" than the lake level, Bowyer had "to build up" the ground with earthen fill. *Id.* at 44. During Hall's testimony, the DNR admitted photographs which were labeled Exhibits 1 and 2 and which depicted "earthen fill placed on top of the island approximately three to four feet deep on the southern half to two-thirds of the island," and excavation occurring on the eastern side of the island. *Id.* at 39–40.

The DNR also called Donald Miller, a resident of Lake Cicott for the past fifteen years who had been active in opposing Bowyer's work at the campground. Miller testified that "[t]he level of the lake will fluctuate six to seven feet on a seven or eight year cycle," that in 1999 "the lake was in one of its low cycles," and that the lake "was very low." *Id.* at 55. Miller testified that he had witnessed Bowyer doing excavation work in Lake Cicott and specifically that he observed Bowyer dig a channel along the east edge of the island, and that Bowyer placed fill on top of that island. Miller testified that "[s]ince 1999 when all this excavation and filling started, the size of the island has increased dramatically," and that before the work there

was "no way that a structure could have been placed onto the island without fear of it being flooded each time the lake came up to its high level." *Id.* at 57. Miller testified that at present the island is "high enough that when the lake is high it's not covered by water," that the channel fill was "absolutely" removed from a point in the lake below the culvert, and that he recorded eighty-four instances in which he observed Bowyer "doing excavating fill work out at the campground or on the island." *Id.* at 57, 59. Miller explained that some of the work he observed Bowyer performing was done above the actual water level at the time "because the lake was low." *Id.* at 85.

Robert Wilkinson, the head of the Surveying and Mapping Section of the DNR's Division of Water, testified that he first worked on this case in 1999. During Wilkinson's testimony, the DNR admitted three aerial photographs of Lake Cicott's southern shore that were taken in April 1998, April 2001, and Spring 2005. Wilkinson and his employees in the Surveying and Mapping Section superimposed two sets of lines on all three exhibits. The first line, depicted in light blue, traced the actual water line of Lake Cicott as it appeared in April 1998. A second set of lines, depicted in dark blue, traced the actual water line as of the April 2003 survey conducted by Wilkinson.[9]

Wilkinson testified that, at the time of the April 2003 survey, the actual water level was 698.2 feet, and that on March 4, 2005, around the time the Spring 2005 photograph was taken, the actual water level was 704.1 feet. Wilkinson testified

---

9. Wilkinson also superimposed two other sets of lines depicting where significant alterations in the lakebed occurred (red lines) and where no significant alterations had occurred (green lines). Wilkinson testified that the "significant alteration[s]" were based upon his judg-

ments. Transcript at 94. At one point in Wilkinson's testimony, Bowyer objected to Wilkinson's ability, based upon his experience as a surveyor, "to state an opinion as to the lake bed being changed." *Id.* at 106. The court sustained Bowyer's objection.

that, although the actual water level in 1998 was unknown, a comparison of the other two photographs and the light blue line demonstrates that the actual lake level was somewhere between 698.2 and 704.1 feet. In the 1998 photograph, the island is depicted as "a faint outline consistent with brush or scrub or vegetation at or near the surface of the lake," and that it appears "flush with the water surface." *Id.* at 99, 123. As explained by Wilkinson, the 2005 photograph, where the water level is at 704.1 feet, shows the island "very clearly," and that it now contains structures. *Id.* at 100. Wilkinson indicated that if the structures, including a trailer and porch, had been placed on the island in 1998, they "would probably [have been] in the water." *Id.* Wilkinson testified that the island in

2005 is "well above 702.22 feet," which was underscored by the fact that, although the island was clearly visible, the water was actually "[a]bout 1.9 feet above" the legal lake level. *Id.* at 101, 115.

After the DNR rested, Bowyer moved for involuntary dismissal pursuant to Ind. Trial Rule 41(B) [10] "because the State has failed to present any evidence to show that Mr. Bowyer knowingly violated the statute or when and where he violated the statute." [11] *Id.* at 130. The court denied Bowyer's motion.

Bowyer was then called to the stand and testified that he was in "the excavating and construction business" and had been in excavating since "[a]bout 1957," and that

---

10. At the hearing, Bowyer termed his motion as one for "[j]udgment on the evidence." Transcript at 132. Such a motion, however, applies only to trials before a jury. *See* Ind. Trial Rule 50(A) (providing for judgment on the evidence "[w]here all or some of the issues in a case tried *before a jury or an advisory jury* are not supported by sufficient evidence ...") (emphasis added). Thus, we treat Bowyer's motion as having been made pursuant to Ind. Trial Rule 41(B), which allows motions for involuntary dismissal "[a]fter the plaintiff or party with the burden of proof upon an issue, in an action tried by the court without a jury, has completed the presentation of his evidence thereon...." *See also Plesha v. Edmonds ex rel. Edmonds,* 717 N.E.2d 981, 985 (Ind.Ct.App.1999) (noting that "a motion for judgment on the evidence under Indiana Trial Rule 50 is improper at a bench trial," and that therefore "[b]ecause the instant case was tried before the court without a jury, it should be treated as a motion for involuntary dismissal under Trial Rule 41"), *reh'g denied, trans. denied.*

11. Bowyer argues in his reply brief that he objected to each of the aerial photograph exhibits as they were offered and that, although his objections were first overruled, the judge later "reversed himself and *sustained the objections.*" Appellant's Reply Brief at 19. He also implies in his appellant's brief that the three exhibits had been stricken.

When Exhibit 3, the first of the three photographs, was offered, Bowyer objected, stating:

Your Honor, I'm not rejecting the survey. He's saying there are alterations here. That involves a judgment about whether the lake bed is in its natural state or not. The fact that the man could be an excellent surveyor does not qualify him to talk about the natural state of the lake bed.

Transcript at 94. After the court overruled Bowyer's objection, he asked the court "just so the record is clear, the Court has ruled that the exhibit is admissible, I understand that, but are you saying that the expression of opinion, that is, 'significant alteration,' that this witness is qualified to testify as to that matter?" *Id.* at 95. The court replied: "Based on his reliance on this exhibit, yes, that's what my ruling is." *Id.* at 95–96. Bowyer made the same objections when Exhibits 4 and 5 were offered. Near the end of Wilkinson's direct testimony, Bowyer objected "to [his] qualifications ... to testify as to excavation and fill.... He can testify as to surveying." *Id.* at 102. The court sustained Bowyer's objection. Finally, in the trial court's order issued on September 14, 2009, as will be more thoroughly discussed below, the court made findings related to the exhibits to the extent that they demonstrated a change in the island's level and that a structure can be seen on it. Appellant's Appendix at 21.

he continued to believe that Lake Cicott was a private lake which he owned, but that, as of the date the court declared it public, it was public. *Id.* at 134. Bowyer testified that the lake fluctuates by as much as ten feet in either direction, which he termed "extreme," and that he believed the shoreline depended "on where the water level was." *Id.* at 139. Bowyer testified that after the DNR obtained the TRO, he did not "put fill into the water of the lake," but that he did fill "above the water level." *Id.* at 141. Bowyer also testified that, since the court found the legal water level to be 702.22 feet he has not "done anything." *Id.* at 142. He testified that "the right-of-way of Highway 24," which runs along the south edge of the lake, takes "part of Lake Cicott," and thus the lake is "hardly in its original condition ... before the white man came," and that a monument has not been erected on his property marking the legal water level of the lake. *Id.* at 154.

During Bowyer's direct testimony, he introduced exhibits including a letter dated April 18, 2000 from the IDEM regarding his "After–the–Fact" request for "authorization for the placement of approximately .28 acres of fill material into Lake Cicott to help stabilize an eroding roadbed." Exhibit A. The letter granted Bowyer authorization, but it also noted that it "does not relieve [Bowyer] from the responsibility of obtaining any other permits or authorizations that may be required for this project or related activities from IDEM or any other agency or person." *Id.* Bowyer also introduced a letter from the United States Army Corps of Engineers dated August 4, 2000, authorizing his request to dredge the lakebed, install a boat ramp, and place riprap for stabilization. Bowyer introduced a third exhibit which was a letter from the Indiana Department of Transportation ("INDOT") dated February 21, 2000, which stated that "[w]e do plan on install-

ing a Guard Rail on U.S. 24 at the location that you filled on Lake Cicott." Exhibit C.

On cross-examination, Bowyer admitted that he dug the trench on the east side of the island and placed that fill on the island as had been observed by Hall during his March 2001 inspection, explaining that "it's not near the lake. The lake is clear out in here someplace." Transcript at 168. When the DNR asked a clarifying question whether this was "in 2001 after DNR filed in this case and said that [Bowyer] needed to stop [his] work because the lake was public and that [he was] working below the shoreline," Bowyer replied that "I mean, we appealed that, of course, and it wasn't final until after the appeal." *Id.* at 169. The DNR also asked Bowyer about his conversations with Miller, who had told him that he was working below the water line, and Bowyer stated that Miller "tried to tell [Bowyer] some things, and I sure don't agree with him." *Id.* at 170.

Bowyer also recalled Wilkinson and asked the question: "If you stand on Mr. Bowyer's campground on the shoreline of the lake in the vicinity of the water level can you state without consulting your instruments with certainty whether you're within the 702.22 feet lake level or outside the water level of that lake?" *Id.* at 214. Wilkinson replied, "[n]o, I can't tell," and indicated that he would need his surveying instruments to be sure. *Id.* Bowyer asked him, "how can a person know if he's below [or above] the water level," and Wilkinson replied: "I would recommend that they hire a surveyor." *Id.* at 215.

The court ordered the parties to submit briefs, and the DNR filed its Closing Argument on December 22, 2008. On March 10, 2009, Bowyer filed his Closing Argument as well as a request for oral argument and request for findings. On March 16, 2009, the court granted both of Bow-

yer's requests. On March 20, 2009, the DNR filed its Reply on Closing Argument. On May 19, 2009, the trial court held a hearing at which closing arguments were heard, and the parties were given thirty days to submit proposed findings of fact and conclusions of law.[12] On June 10, 2009, Bowyer filed Proposed Findings.[13] On June 15, 2009, the DNR filed its Proposed Findings of Fact, Conclusions of Law, and Judgment.

On September 14, 2009, the court entered its Findings of Fact, Conclusions of Law, and Judgment, which it amended on September 23, 2009 but dated nunc pro tunc September 14, 2009 (the "September 14, 2009 Order"). The September 14, 2009 Order stated:

> Based on the forgoing [sic] Findings of Fact, Conclusions of Law and legal precedent, the [DNR's] Verified Complaint for Permanent Mandatory Injunction and Damages is granted. [Bowyer] is ordered to remove all fill placed in Lake Cicott. More specifically, [Bowyer] is ordered to (1) remove all rip rap [he] placed along U.S. 24; (2) remove all soils [he] placed in the new campground area; (3) remove all fill [he] placed in the west end of the campground; (4) remove the bridge to and all fill and structures [he] placed on the island; and (5) remove all fill [he] placed on the east end of the campground. [Bowyer] is further ordered to cooperate with [DNR] to restore Lake Cicott back to its natural condition or as close as can [be] possible. . . .

Appellant's Appendix at 24–25. On October 13, 2009, Bowyer filed a motion to correct errors, which the court denied on November 24, 2009. The court certified

Bowyer's claim against the DNR for appeal pursuant to Ind. Trial Rule 54(B).

**Issue and Standard of Review**

 The issue is whether the trial court's September 14, 2009 Order granting the DNR's complaint for permanent mandatory injunction and damages was clearly erroneous. Where, as here, a party has requested specific findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A), we engage in a two-tiered standard of review. *Garling Rehearing*, 766 N.E.2d at 410. "We determine whether the evidence supports the findings and the findings support the judgment." *Id.* (quoting *Chidester v. City of Hobart* 631 N.E.2d 908, 910 (Ind.1994)). "In deference to the trial court's proximity to the issues, 'we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment.'" *Id.* (quoting *Oil Supply Co. v. Hires Parts Serv., Inc.*, 726 N.E.2d 246, 248 (Ind.2000)). "We do not reweigh the evidence, but only consider the evidence favorable to the trial court's judgment." *Id.* Bowyer, as the party appealing from an adverse judgment, labors "under a heavy burden, but one that may be overcome by showing that the trial court's findings are clearly erroneous." *Id.*

 Moreover, while we review findings of fact under the clearly erroneous standard, we review *de novo* a trial court's conclusions of law. *Garriott v. Peters*, 878 N.E.2d 431, 437 (Ind.Ct.App.2007) (citing *Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind.2002)), *trans. denied*. "Where cases present mixed issues of fact and law, we have described the review as applying an abuse of discretion standard." *Id.* (quoting *Fraley v. Minger*, 829 N.E.2d 476, 482 (Ind.2005)). We will conclude a judgment

---

12. The transcript of this hearing is not contained in the record on appeal.

13. A copy of Bowyer's Proposed Findings is not contained in the record on appeal.

is clearly erroneous if no evidence supports the findings, the findings fail to support the judgment, or if the trial court applies the incorrect legal standard. *Id.* "In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made." *Id.* (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

## Discussion

Before addressing the merits of Bowyer's arguments, we begin with Bowyer's argument that "[m]any of the Findings of Fact of the Trial Court ... are what the Court of Appeals has termed 'surplusage'," in that they "simply restate[ ] testimony without adopting that testimony as found to be accurate or credible." Appellant's Brief at 11–12. Bowyer cites Findings 19–25 as suffering from this error, and cites to *Garriott v. Peters*, which states that "[w]hen a trial court enters purported findings that merely restate testimony, this court will not 'cloak the trial court recitations in the garb of true factual determinations and specific findings as to those facts.'" 878 N.E.2d at 438 (quoting *Augspurger v. Hudson*, 802 N.E.2d 503, 515 (Ind.Ct.App.2004) (Sullivan, J., concurring in result)); *see also In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind.Ct.App. 2003) ("A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z.") (citing *Perez v. U.S. Steel Corp.*, 426 N.E.2d 29, 33 (Ind.1981)). In *Garriott*, this court, citing to *Perez*, noted that we treat such "purported findings" as being mere "surplusage." *Id.*

At least one case from this court has acknowledged that a strict reading of *Perez* "appears applicable only to administrative fact-finding." *Weiss v. Harper*, 803 N.E.2d 201, 206 n. 8 (Ind.Ct.App.2003). In any event, we need not reexamine the applicability of *Perez* in the context of a trial court's order because here, the court provided sufficient findings that do not suffer from any supposed defect and upon which it could base its judgment. Findings 19–25 pertain to the November 13, 2008 hearing on the DNR's complaint. We find that at least Finding 21, however, expresses a valid Finding of Fact where it states:

Hall testified that he observed excavating and filling in of the lake. He testified that over the years he observed the island changing. To demonstrate this fact, Hall took pictures of the work being performed. Exhibits 1 and 2 depict excavating of soil from the lake and placement of the material as fill on portions of the island.

Appellant's Appendix at 20–21. Thus, in Finding 21, the court acknowledged that it regarded Hall's testimony of his observations as a fact based upon Exhibits 1 and 2, which were pictures Hall took and the court viewed. Moreover, Bowyer does not challenge Findings 26[14] and 27, both of which lend support to the court's Conclusions of Law. Finally, we reiterate that even in *Perez*, the inclusion of findings deemed surplusage does not result in harmful error. *Perez*, 426 N.E.2d at 33. We therefore confine our review of the trial court's Findings of Fact to those findings which cannot be termed surplusage.

---

14. We note that Bowyer appears to challenge Finding 26 as surplusage in his reply brief. Because Bowyer makes this argument for the first time in his reply brief, he has waived this argument. *See Weldon*, 896 N.E.2d at 1186; *see also* Ind. Appellate Rule 46(C). However, we also note that Finding 26 does not merely recite testimony but rather indicates what the trial court found the aerial photos to depict.

Turning to Bowyer's substantive arguments, he challenges: (A) the impact of our previous opinions; and (B) portions of the trial court's September 14, 2009 Order. Initially, we note the relevant statute which Bowyer is charged with violating, Ind.Code § 14–26–2–6 (1998): [15]

A person may not change the level of the water or shoreline of a public freshwater lake by:

(1) excavating;

(2) filling in; or

(3) otherwise:

(A) causing a change in the area or depth of; or

(B) affecting the natural resources, scenic beauty, or contour of;

the lake below the waterline or shoreline without having a written permit issued by the department.

### A. *Impact of Our Previous Opinions*

As noted at the outset, Bowyer makes arguments relating to our previous opinions in this matter. Specifically, Bowyer raises questions about the impact of the decisions of the trial court which were affirmed by this court regarding: (1) the determination that Lake Cicott is a public freshwater lake; and (2) the determination of Lake Cicott's legal lake level. We address each argument separately.

### 1. *Public Freshwater Lake Determination Discussed in Garling*

■ Bowyer challenges the holding of *Garling* that Lake Cicott "had been public

for more than 50 years" and that "in fact what the judgment found was that the lake had been regulated and used by the public, and it was not a public lake until [the trial court] declared it to be so." Appellant's Brief at 13 n. 5. Bowyer argues that the trial court's findings of fact in its December 11, 2000 order are "evidence of *private ownership*," and that "[t]he document in the chain of title which gives [DNR] the rights of ownership it has is the 12/11/00 Judgment. . . ." *Id.* at 14. Bowyer argues that "[u]ntil [the trial court] declared that the lake was a public lake, its status was questionable at the least." *Id.* at 15. The implications of Bowyer's arguments are that he cannot be responsible for actions taken prior to the determination on December 11, 2000 that Lake Cicott was a public freshwater lake.

The DNR argues that "[o]n June 7, 1999, [DNR] sent a letter to Defendant telling him that his work on the shoreline of Lake Cicott, a public freshwater lake, without a permit violated Indiana law" and "[t]he trial court's decision that Lake Cicott was a public lake was based on over fifty years' worth of evidence that [it] was public and the [DNR] and its predecessor agencies had exercised jurisdiction over the lake." Appellee's Brief at 15.

We begin by noting the statutory definition of public freshwater lake as: "a lake that *has been used* by the public with the acquiescence of a riparian owner." Ind. Code § 14–26–2–3(a) (emphasis added). The definition of public freshwater lake

---

**15.** Ind.Code § 14–26–2–6 was repealed by Pub.L. No. 152–2006, § 4, and was replaced by Ind.Code § 14–26–2–23, as amended, which states in relevant part:

(a) Unless a person obtains a permit from the department under this section and conducts the activities according to the terms of the permit, a person may not conduct the following activities:

(1) Over, along, or lakeward of the shoreline or water line of a public freshwater lake:

(A) excavate;

(B) place fill; or

(C) place, modify, or repair a temporary or permanent structure. . . .

contains a retroactive element in its very text. Moreover, and as noted by the DNR, it sent a letter to Bowyer dated June 7, 1999, which put him on notice that he was placing fill in a public freshwater lake which required a permit, and although Bowyer challenges whether he received the letter, the trial court in its September 14, 2009 Order so concluded, and, mindful that we do not reweigh evidence, we cannot say that this finding is clearly erroneous.

Also, the evidence examined by the trial court and in our opinion in *Garling* included a 1977 filing made by the DNR with the Cass County Clerk identifying "Lake Cicott as a 'public freshwater lake and as such subject to this Department's jurisdiction.'" *Garling*, 756 N.E.2d at 1031. The determination by the DNR was based in part on the fact that "as far back as 1948, the predecessor to the DNR, the Department of Conservation, began receiving requests for permission to modify Lake Cicott...." *Id.* Thus, based upon this evidence, we recognized that "[o]ver the last 50 years, the Indiana Department of Conservation, and thereafter the DNR, has consistently regulated Lake Cicott as a public freshwater lake." *Id.*

Finally, we note that the trial court's December 11, 2000 Order stated that "Lake Cicott is recognized to be *and* is hereby declared to be a public freshwater lake." Appellant's Appendix at 154 (italics added). We note that the term "recognize" has been defined as: "1. [t]o know to be something that has been perceived before ... 2. To know or identify from past experience or knowledge." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1460 (4th ed.2006). Thus, contrary to Bowyer's contentions, the court's order, which "recognized" Lake Cicott "to be" public, was intended to state that Lake Cicott was a public freshwater lake prior to, as well as after, December 11, 2000.

We therefore decline Bowyer's invitation to find that Lake Cicott was a public freshwater lake only after the trial court's December 11, 2000 order or our opinion in *Garling*.

### 2. *Legal Lake Level Determination Discussed in Bowyer II*

We turn next to Bowyer's claim that, until the trial court's August 28, 2006 Order setting the legal lake level at 702.22 feet, which we affirmed in *Bowyer II*, "the exact boundaries of the lake were undefined...." Appellant's Brief at 13. Bowyer argues that "as the Court of Appeals found in an earlier appeal in this case the determination of the legal water level requires expertise in botany, and there is no evidence that [ ] Bowyer possess[es] the necessary expertise to make this determination." *Id.* at 14. Bowyer argues that the DNR's "own witnesses were unable to determine the location of the legal water level at the campground...." *Id.*

Bowyer raises this argument with the suggestion that we conclude: "Until the exact legal water level was found ... to be 702.22 feet, it was reasonable for [ ] Bowyer to believe that if he did not work below the *actual* water level in placing fill and removing fill, he was not changing the shoreline or water level by his activities." *Id.* at 15. Bowyer buttresses this point with his argument that the record does not show that he "placed any fill in the lakebed or took any fill out of the lakebed after [the trial court's] decision in 2006 ..." or that he "placed any fill at or below the **actual waterline** after being served" with the court's TRO in 2001. *Id.*

The DNR argues that "the establishment of a 'legal' water level does [not] mean that a lake does not have a water level for purposes of the statute," and that

the plain meaning of the text of Ind.Code § 14–26–2–4 demonstrates that "a waterline always exists, whether legally established or not." Appellee's Brief at 16. The DNR argues that "the waterline was discernable to those who wished to know it." *Id.* The DNR argues that Hall "knew the established water level from an outlet culvert at the east end" of the lake. *Id.* The DNR argues that "it was not reasonable for [Bowyer] to believe that simply because he was on dry land, he was not working below the waterline" because he knew that the lake "could fluctuate five to ten feet up and down...." [16] *Id.* at 15.

Initially, we note that Bowyer's characterization of Wilkinson's testimony that he was "unable to determine the location of the legal water level at the campground" does not accurately reflect the relevant exchange at the hearing. As noted earlier, Bowyer recalled Wilkinson to the stand and asked: "If you stand on Mr. Bowyer's campground on the shoreline of the lake in the vicinity of the water level can you state *without consulting your instruments with certainty* whether you're within the 702.22 feet lake level or outside the water level of that lake?" Transcript at 214 (emphasis added). Wilkinson replied, "[n]o, I can't tell," and indicated that he would need his surveying instruments to be sure. *Id.* Bowyer then asked "how can a person know if he's below [or above] the water level," and Wilkinson replied: "I would recommend that they hire a surveyor."

*Id.* at 215. This testimony is consistent with the DNR's position that, although the waterline may have been unknown to Bowyer, it certainly was not unknowable, and Bowyer could have hired a surveyor, or even contacted the DNR, for a determination of Lake Cicott's water line.

As alluded to in *Bowyer II*, the legally established shoreline is not synonymous with the shoreline formed by the actual water level of a lake at a given point in time. Indeed, we note the relevant statute, Ind.Code § 14–26–2–4, defines "[s]horeline or water line" as follows:

(1) if the water level has been legally established, the line formed on the bank or shore by the water surface at the legally established average normal level; or

(2) if the water level has not been legally established, the line formed by the water surface at the average level as determined by:

(A) existing water level records; or

(B) if water level records are not available, the action of the water that has marked upon the soil of the bed of the lake a character distinct from that of the bank with respect to vegetation as well as the nature of the soil.

The Indiana Code makes clear that there are three alternative definitions of a legal "shoreline or water line," and that one of the three definitions will apply to a body of

---

16. Bowyer argues in his reply brief that the DNR's argument that "the legal water level was *always discernable*" is refuted by our opinion in *Bowyer I* where we reversed the trial court's finding of contempt for failing to comply with the TRO, noting that the DNR "had not undertaken to find Lake Cicott's 'shoreline' under the two alternative definitions in" Ind.Code § 14–26–2–4(2). Appellant's Reply Brief at 14 (quoting *Bowyer I*, 798 N.E.2d at 918–919). The reasoning of *Bowyer I*, however, was based upon the "will-

ful disobedience" requirement inherent in a finding of contempt for failing to comply with a TRO, which requires that "[t]he order allegedly violated must have been so clear and certain that there could be no question as to what a party must do, or not do, and so there could be no question regarding when the order is violated." *Bowyer I*, 798 N.E.2d at 918. At this stage, we are not examining the TRO but rather the legality of Bowyer's unpermitted activities, which were thoroughly examined at the November 13, 2008 hearing.

water in a hierarchical order. Thus, we do not find Bowyer's argument that it was reasonable for him to "believe that if he did not work below the *actual* water level in placing fill and removing fill, he was not changing the shoreline or water level by his activities" to be compelling.

**B. Challenges to The September 14, 2009 Order**

Bowyer challenges the veracity of the court's September 14, 2009 Order based upon grounds of: (1) statutory construction; and (2) sufficiency. We address each of Bowyer's arguments separately.

**1. Statutory Construction**

Many of Bowyer's arguments constitute challenges to the trial court's construction of Ind.Code § 14–26–2–6. Specifically, Bowyer argues that "[t]he alterations contemplated by the statute must be **significant**" because "[n]umerous everyday activities alter the shoreline and the water level in minor ways," such as "taking a fish out of the water" or "dipping a bucket in the lake." Appellant's Brief at 10. The DNR argues that although Section 6 does not have a requirement that alterations be "significant," the evidence demonstrates "that the alterations done by [Bowyer] are significant" and "are permanent changes requiring ... large expenditures of time and energy and are plainly apparent to the casual observer." Appellee's Brief at 12.

In addition, Bowyer argues in his reply brief that "alteration to the island [the islandshore] is not alteration of the lake's shoreline [the lakeshore]—the shoreline of the island is not the shoreline of the lake *because it is an island.*" Appellant's Reply Brief at 11 (brackets and emphasis in original).

Questions of statutory construction are reviewed *de novo. Bowyer II,* 882 N.E.2d at 758. "The goal of statutory construction is to determine, give effect to, and implement the intent of the legislature." *Id.* at 758–759 (citing *Sales v. State,* 723 N.E.2d 416, 420 (Ind.2000)). "The legislature is presumed to have intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result." *Id.* at 759 (citing *Sales,* 723 N.E.2d at 420). "Courts must consider the goals of the statute and the reasons and policy underlying the statute's enactment." *Id.* "If the legislative intent is clear from the language of the statute, the language prevails and will be given effect." *Id.* (citing *Hall Drive Ins., Inc. v. City of Fort Wayne,* 773 N.E.2d 255, 257 (Ind. 2002)). "Where statutes address the same subject, they are *in pari materia,* and we harmonize them if possible." *Id.* (quoting *U.S. Gypsum, Inc. v. Ind. Gas Co.,* 735 N.E.2d 790, 802 (Ind.2000)).

As noted above, Ind.Code § 14–26–2–6 makes it illegal for a person, without having a permit issued by the DNR, to alter either the water level or the shoreline of a public freshwater lake by excavating or filling in the lakebed below the waterline or shoreline. Additionally, even if not due to excavating or filling, the statute illegalizes other unpermitted activities which either change the area or depth of or affect the natural resources, scenic beauty, or contour of, the lake below the waterline or shoreline which changes the water level or shoreline of the lake.

First, as the DNR notes in its brief, Section 6 does not contain an explicit requirement that the alterations be significant. Thus, Bowyer's repeated insistence that the DNR must prove that the alterations are significant has no merit. Here, it appears that the legislature has left it to the DNR's discretion to determine the significance of any alterations of the shoreline or water level when it decides whether to file a complaint on the matter. Indeed,

although Bowyer may be technically correct that "dipping a bucket in the lake" may affect the water level on some miniscule basis, it is hard to fathom a scenario in which the DNR would decide to file a complaint for such an alteration.

Next we turn to Bowyer's suggestion that altering the shoreline of an island resting within a lake does not violate Ind. Code § 14–26–2–6 because an islandshore and a lakeshore are different. We believe that this argument runs afoul of the plain meaning of Ind.Code § 14–26–2–4, which defines the word "shoreline." Section 4 defines the shoreline for lakes in which the water level has been legally established generally as "the line formed on the bank or shore by the water surface at the legally established average normal level...." I.C. § 14–26–2–4(1). Importantly, Section 4 does not make reference to the lake's boundary or lake's edge, words one might expect to find if the definition only applied to the boundary of the lake itself. Rather, Section 4 makes general reference to a point on a piece of land representing the water's edge at the legal lake level. We also note that Section 4's definition of shoreline is written generally for lakes whose water levels have not been legally established.

Thus, the Indiana Code defines a lake's shoreline as any point in which the lake's water creates a mark on the land. Indeed, Bowyer does not direct us to, and our research does not reveal, any provision of the Indiana Code which specifically regulates the alterations of an island's shoreline contained in Indiana's public freshwater lakes. Were Bowyer's argument to succeed, the consequence would be that the alteration of such an island's shoreline is not regulated by the DNR or other Indiana agency.

We therefore conclude that the trial court did not err in its construction or application of Ind.Code § 14–26–2–6.

2. *Sufficiency*

■■■ Bowyer challenges the sufficiency of the evidence for which the two-tiered standard of review recited above is particularly appropriate. Bowyer argues that "[t]he shoreline of Lake Cicott has been frequently altered," including by the construction of U.S. Highway 24 in 1927 and a railway, which changed the shoreline "from what it was originally when the Miami Indians or their predecessors first arrived," and that "these activities occurred before 1999...." Appellant's Brief at 11. Bowyer also argues that "there is no evidence that the changes in the contours of the lakebed upon which [DNR] relies in this case are [his] work...." *Id.* Bowyer argues that if we disregard the Findings of Fact which are surplusage, "nowhere in the Findings of Fact or the Trial Court's Conclusions of Law is a determination made that the fill ... was placed in the lake by [him]." *Id.* at 12.

The DNR argues that when Bowyer "converted the small island in the lake into a peninsula, he significantly changed the shoreline of Lake Cicott." Appellee's Brief at 11. The DNR argues that the court's September 14, 2009 Order "was properly based on the evidence that indicated that [Bowyer's] permitless activity to enlarge and heighten the island ... and place a bridge to connect the island to the campground included work below the waterline or shoreline that affected the contour of Lake Cicott...." *Id.* The DNR argues that "[c]ontrary to [Bowyer's] claim, ample evidence indicates that between 1999 and 2005, [he] significantly altered the shoreline of the lake in the course of his work to make the island a peninsula...." *Id.* at 12. The DNR points

to the photographs entered into evidence as Exhibits 1–5 as well as the eyewitness testimony by Hall who testified "that the shoreline was altered." *Id.* The DNR argues that Bowyer's "claim that the shoreline has been altered numerous times before has no effect on whether his own actions are legal." *Id.* The DNR argues that Bowyer's "claim that he is not responsible [for] the alteration of the shoreline . . . is utterly without merit," because he "admitted that he excavated the fill and placed it on the island" and he "admitted that he bought the campground . . . where the work occurred." *Id.* at 13.

In its September 14, 2009 Order, the trial court properly found in relevant part:

3. On June 7, 1999, [DNR] sent a letter to [ ] Bowyer informing him that he was placing fill in a public freshwater lake and that a search of [DNR] files revealed that no permit had been obtained for the project, which is required by law. [DNR], in bold letters, stated that "[t]here is to be *no* further construction at this site until this matter is resolved."

4. On January 4, 2000, [DNR] conducted an inspection of [Bowyer's] property. The inspection report stated that it was clear from visual observations along the wooden seawalls that the lake was about five (5) feet lower than the actual waterline. It was also observed that fill was placed about four (4) feet deep, two hundred (200) feet long and twenty (20) feet wide at the Site. Attached to the report were numerous pictures that depict work being done in Lake Cicott.

\* \* \* \* \* \*

6. [ ] Bowyer obtained approvals from the U.S. Army Corp [sic] of Engineers ("Army Corps") (Defense Exhibit B) on August 4, 2000 and the Indiana Department of Transportation ("IN-

DOT") (Defense Exhibit C) on February 21, 2000. Both approvals were obtained after the June 7, 1999 [DNR] letter and filing on this matter.

\* \* \* \* \* \*

16. On March 20, 2008, the Indiana Court of Appeals affirmed this Court's order establishing the average normal water level of Lake Cicott at 702.22' NGVD'29.

\* \* \* \* \* \*

26. In Exhibit 3, the island is hardly visible and the lake level is between 698.2' and 704.1' NGVD'29. In Exhibit 4, at a higher water level, 704.1'[ ]NGVD'29, which is above the legal lake level of 702.22' NGVD'29, the island is not only visible but a structure can be seen on the island.

27. [ ] Bowyer admitted that he dug out fill from the lake and placed it on the island. [Bowyer] admitted he performed work in Lake Cicott but argued that he thought he owned the lake and that he did not know the normal waterline of the lake.

Appellant's Appendix at 18, 20–22. Additionally, the court recited the following Conclusions of Law:

11. . . . [Bowyer] had a duty to determine if his activities in a public freshwater lake required a permit from [DNR].

12. [Bowyer] commenced work without a permit.

13. When [ ] Bowyer was advised by [DNR] that his activities were not approved, he was obligated to cease and desist work until obtaining a proper permit.

\* \* \* \* \* \*

16. Pursuant to Ind.Code § 14–26–2–3, Ind.Code § 14–26–2–4, and Ind. Code § 14–26–2–6, [ ] Bowyer had ade-

quate notice that his activities were occurring in a public freshwater lake, below the waterline or shoreline.

17. [Bowyer] has admitted to excavating from and placing fill in Lake Cicott and pursuant to Indiana law, no change is allowed without a permit.

*Id.* at 23–24.

Other than the general statement in Bowyer's brief that "nowhere in the Findings of Fact or ... Conclusions of Law is a determination made that the fill ... was placed in the lake by [Bowyer]," which is refuted by the Conclusions of Law cited above, Bowyer does not challenge the court's conclusions themselves. Appellant's Brief at 12. Rather, the thrust of Bowyer's arguments is that the findings properly found by the court were insufficient to prove that Bowyer violated Ind. Code § 14–26–2–6. We disagree.

Regarding Bowyer's argument that the shoreline of Lake Cicott had been altered prior to his purchase of the campground in 1999 and subsequent activity, we note that Bowyer does not present evidence that this was done without the proper permits or other authorization. Moreover, distilled down, Bowyer's argument basically suggests that once a plot of land has been altered, any subsequent work by any party, no matter how far into the future such work happens, may be performed without seeking a permit. The fact that a shoreline may have been previously altered does not excuse a subsequent party who alters the shoreline from obtaining the proper permits.

As to Bowyer's remaining arguments challenging the sufficiency of the evidence that he violated Ind.Code § 14–26–2–6, the court made proper findings that Bowyer received a letter from the DNR dated June 7, 1999 informing him that his placing

fill in Lake Cicott required a permit, and that he must cease construction until the matter was resolved. On January 4, 2000, Hall observed that Bowyer was continuing to excavate and fill below the waterline, and he documented his observations by taking photographs. Additionally, the exhibits admitted by Bowyer from IDEM, the U.S. Army Corps of Engineers, and INDOT, as found in Finding of Fact 6, indicate that Bowyer placed fill to stabilize a roadbed, dredged the lakebed and installed a boat ramp, placed riprap for stabilization, and filled an area of Lake Cicott along U.S. 24. Also, Bowyer admitted at the hearing that he excavated fill from the lakebed and placed it on the island. Bowyer never obtained a permit from the DNR for his activities.

■■■ The DNR admitted three aerial photographs which depict the changes to Bowyer's property and the shoreline of Lake Cicott between 1998 and 2005. Exhibit 3, taken in April 1998, depicts the island consisting of scrubland that was almost submerged or "flush with the water surface." Transcript at 123. When the 1998 photograph was taken, the water level was between 698.2 and 704.1 feet NGVD'29. In the spring of 2005, another photograph, in evidence as Exhibit 4, was taken. In the 2005 photograph, the lake level is known to be 704.1 feet NGVD'29. In the photo, the island is noticeably above the water line and has a structure built on top which Hall described as a mobile home and a lighthouse, as well as "a bridge abutment that makes a bridge from the island to the shoreline on the south side of the lake." *Id.* at 38. Indeed, the island has been formed into a peninsula leading from the campground out to its northern edge.[17] Thus, despite the fact that the

---

**17.** In Bowyer's reply brief, he challenges the

water levels associated with Exhibits 3–5, not-

water level is increased in the 2005 photograph, the land depicted is noticeably higher.

Finally, we note that at one point in Bowyer's reply brief, he acknowledges that the record does contain evidence that "before 2006 ... Bowyer did work below the 702.22 foot legal water level." Appellant's Reply Brief at 7 (footnote omitted). Based upon our review of the record, we conclude that the trial court's Findings of Fact, Conclusions of Law, and Judgment in the September 14, 2009 Order were not clearly erroneous.[18] *See DeMayo v. State ex rel. Dep't of Natural Res.*, 182 Ind.App. 241, 242, 245, 394 N.E.2d 258, 259, 261 (1979) (holding that injunctive relief was proper for "illegal changes in the shoreline" of a lake and ordering the defendants "to remove five feet of their patio-seawall construction which [encroached] upon the le-

gal shoreline of Lake Gage in Steuben County and to restrain from building any construction altering the shoreline until their prior compliance with all applicable statutes").

## Conclusion

For the foregoing reasons, we affirm the trial court's grant of a permanent injunction and damages in favor of the DNR.

Affirmed.

DARDEN, J., and BRADFORD, J., concur.

ing with regard to Exhibit 4 that "[t]here are as many as fifty-seven days between the photo and the survey and, given the range of fluctuation of the lake, the water could have risen or fallen a considerable amount between the survey and the photo." Appellant's Reply Brief at 8–9. Because Bowyer makes this argument for the first time in his reply brief, he has waived this argument. *See Weldon*, 896 N.E.2d at 1186; *see also* Ind. Appellate Rule 46(C).

18. In his brief, Bowyer also appears to challenge the trial court's denial of his motion for involuntary dismissal pursuant to Ind. Trial Rule 41(B). Because we find that the evidence was sufficient to support the judgment, we need not discuss the propriety of the denial of Bowyer's motion for involuntary dismissal. *See F.D. Borkholder Co., Inc. v. Sandock*, 274 Ind. 612, 615 n. 2, 413 N.E.2d 567, 569 n. 2 (1980) ("[G]enerally, a conclusion by this Court that the evidence was sufficient to support the judgment would eliminate the need for a discussion of the propriety of the denial of a motion for an involuntary dismissal.").