## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 31 2017, 11:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Jonathan O. Chenoweth
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Dewayne Dunn,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

October 31, 2017

Court of Appeals Case No.
20A03-1705-PC-936

Appeal from the Elkhart Circuit Court

The Honorable Terry C. Shewmaker, Senior Judge

Trial Court Cause No.
20C01-1302-PC-10

**Crone, Judge.**

# Case Summary

Dewayne Dunn appeals the denial of his amended petition for postconviction relief ("PCR"). He argues that he is entitled to relief because he was denied effective assistance of counsel at his murder trial. Specifically, he argues that his trial counsel provided ineffective assistance by failing to consult with a forensic pathologist as to the manner of the victim's death. Based on the record before us, we cannot say that the evidence as a whole leads unerringly and unmistakably to the conclusion that there is a reasonable probability that the evidence produced from consulting with a forensic pathologist would have changed the outcome of Dunn's trial. Therefore, we affirm.

# Facts and Procedural History

[1] The facts underlying Dunn's murder conviction were presented in this Court's memorandum decision in Dunn's direct appeal as follows:

> In September 2008, Dunn lived in an apartment in Elkhart, Indiana with his girlfriend, Letha Sims ("Sims")[, and her seventeen-year-old son Jamar Willie Sims ("Willie")]. Their rental unit was located on the second floor of the apartment building, next door to another unit rented by Angel Torres ("Torres"). The units shared a common balcony [standing approximately six feet from the ground], with an exterior staircase leading to the ground.

> … [O]n the evening of September 3, 2008, Damen Collins ("Collins") was riding his bike near the apartment building when he witnessed an altercation between Dunn and Sims taking place on the balcony. Specifically, he saw Dunn and Sims fighting and heard Sims screaming for help. Torres then came out of his

apartment, but Dunn shoved him back inside. Dunn then knocked Sims halfway down the staircase, and when Sims tried to get away, Dunn grabbed her and dragged her back upstairs. At that point, Collins called the police and left the area. As he was leaving, Collins heard loud noises coming from the area of the fight, but he was unsure what they were.

The first police officer arrived on the scene eight minutes after receiving the dispatch. At that time, Torres was lying [sprawled face down slightly on his left side with his right arm stretched out over a baseball bat] at the bottom of the staircase [with his head] in a pool of blood. He was unresponsive and his breathing was very labored. A baseball bat was positioned underneath Torres's body, and Sims's son and Dunn were standing nearby. Dunn had a cut under his knee, and he was very agitated and shouting that he didn't do anything.

*Dunn v. State*, No. 20A05-1103-CR-160, 2011 WL 6807366, at *1 (Ind. Ct. App. Dec. 22, 2011) (citations, quotation marks, and brackets omitted), *trans. denied* (2012).

Dunn told police that Torres had a baseball bat and had hit him in the back with it while they were on the balcony, and Dunn turned around and pushed Torres. Torres was taken to the emergency room, where physicians determined that he suffered a traumatic head injury, bleeding within the brain, and skull fractures and a significant lung injury. *Id*. at *2. Toxicology tests revealed that Torres's blood alcohol level was .294 but did not detect the presence of any controlled substances. Trial Tr. at 483-84. Torres died on September 5, 2008, after being removed from life support.

[2]     In April 2010, the State charged Dunn with murder. Dunn was represented by attorney Clifford Williams. At trial, the State's theory was that Dunn and Torres were fighting on the balcony, and Torres fell down the stairs. At the bottom of the stairs, Dunn used an unidentified object to inflict Torres's catastrophic and fatal injuries. The defense's theory was that at some point during the fight on the balcony, Torres's back was toward the stairs, and as he and Dunn struggled, Torres fell back, flipped over the railing, and landed on his head. According to the defense, after Torres fell he did not move, and the fall alone caused his injures.

[3]     In support of its case and in addition to other evidence, the State introduced testimony from two pathologists, police evidence technicians, and a blood spatter expert. Dr. Blair Chrenka, the pathologist who performed the autopsy on Torres, found that Torres had a gash on the back of his head, an abrasion on his right flank, broken ribs on the right-hand side, a broken clavicle, a contusion on the right lung, a lacerated liver, and several skull fractures in different areas. He determined that the cause of Torres's death was blunt force trauma to the head, but he was unable to reach a conclusion regarding the manner of death because he did not know the circumstances in which Torres sustained his injuries. *Id.* at 882-83.

[4]     Forensic pathologist Dr. Scott Wagner testified that Torres's skull was fractured in three areas: the sphenoid bone, the petrous ridge, and from the parietal bone on the top right of his skull down to the temporal bone. *Id.* at 946-47. Dr. Wagner explained that the sphenoid bone is located at the front of the skull,

and Torres's sphenoid bone had been "crushed like gravel," which "would shred the brain and cause a great deal of bleeding." *Id*. at 948. Dr. Wagner testified that Torres's liver had "a huge tear right in the center of it." *Id*. at 943. He also stated that there was a line of fracture extending from the first rib highest on the right side of Torres's body all the way down to the tenth rib, and given that the first rib is very thick, the fracture to that rib was of the type that usually occurs "in severe trauma like an automobile crash." *Id*. at 941. He stated that there were additional fractures to the ribs toward the middle of the back on the right side. *Id*. Torres also suffered a separate injury to his clavicle, which was fractured down the middle. Dr. Wagner opined that the cause of Torres's death was "blunt force injuries of the head, chest, and abdomen" and that the manner of death was "homicide." *Id*. at 951. He also testified that while a few of Torres's contusions and scrapes on his hands and feet would be consistent with a fall down the stairs, the "deep injuries" to Torres's skull and chest "would not be consistent with a simple fall down the steps." *Id*. at 954.

[5] The State also introduced DNA evidence identifying the blood found on various surfaces:

> [One] of Dunn's shoeprints, in what was later determined to be Torres's blood, was found on the second step of the staircase. A pool of blood on the pavement at the bottom of the staircase contained Dunn's shoeprint, and Torres's blood was found on the sole of Dunn's shoe. Blood was also found on Dunn's shorts, and DNA testing revealed a mixture of a major and minor profile. Dunn was the source of the major profile, and no conclusions could be drawn from the minor profile. Torres's blood was found on the handle and middle portion of the

baseball bat, and Torres's cellular material was found on the
barrel of the bat.

*Dunn*, 2011 WL 6807366, at *1. Although there were small blood stains on the handle and middle portion of the bat, the amount of blood on the bat was scant. Trial Tr. at 835-37, State's Trial Exs. 21, 22.

[6] Indiana State Police crime scene investigator Dean Marks testified for the State as a blood spatter expert. Marks examined photographs from the crime scene and considered police and lab reports. Marks did not physically inspect the baseball bat. Trial Tr. at 923. There were photographs showing blood stains on the wall at the foot of the stairs, on the pavement, on the side of a nearby car, on the stairwell beam and railing post, and on the steps. Other photographs showed a pool of blood on the pavement emerging from Torres's head and blood on his right shoulder and the front of his shirt. Marks testified that the blood spatter on the wall at the base of the staircase was consistent with a medium-force impact spatter that occurred directly in front of it near ground level. *Id*. at 900-01. He explained that impact spatter is a pattern that results when a blood source is impacted by an instrument. He stated that the blood spatter on the wall was not consistent with someone merely falling down the stairs or with someone stomping or stepping into a puddle of blood in front of the wall. He testified that the spatter patterns on the wall near the base of the stairs showed that a "good amount of energy [was] being applied to a blood source." *Id*. at 920. Marks described the blood pattern on the pavement between the stairwell and the car to the left of Torres's body as a cast-off spatter,

which occurs when an object that has blood on it is swung or flung and the blood flies off the object. Although Marks could not identify the object that was the source of the cast-off spatter, he specified that the object had to have had a large enough surface area "to retain a good amount of blood." *Id*. at 912. Marks testified that the blood spatter on the side of the car, on the pavement between the car and the stairwell, on the stairwell beam and railing post, and on the bottom two steps indicated that an "event" took place between the car and the stairwell and that the patterns of blood spatter would not have come from someone just falling down the stairs. *Id*. at 918-20. Marks explained that the drops of blood on Torres's right shoulder and back and the front of his shirt indicated that Torres had been bleeding while he was upright and before he came to his final resting place and that the drops would make no sense if Torres had consistently lain in that position. *Id*. at 907-08.

[7] The defense supported its theory with the testimony of Sims and her son Willie. Sims testified that she and Torres were drinking beer and ingesting cocaine in his apartment while Dunn was walking the dog. *Id*. at 513, 534. She explained that when Dunn returned, he entered Torres's apartment, and the two started arguing. *Id*. at 513-14. The men went out on the balcony and continued to argue. Torres came back in the apartment, got a baseball bat, and went back out to the balcony. *Id*. at 519. Sims remained inside and heard the sound of someone being hit with a baseball bat and Dunn say, "[D]on't hit me with the bat no more. Stop hitting me with the bat." *Id*. at 520. She then heard a "boom, boom, boom," ran out on the balcony, and saw Torres at the bottom of

the stairs. *Id.* Dunn was still on the balcony, and she asked him what had happened. He told her that Torres "fell down the stairs[.]" *Id.* at 521. She testified that Dunn went down the stairs and tried "to get [Torres] up." *Id.* She explained that Dunn "had [Torres's] arm … pulling him up, telling him to get up." *Id.* at 522. Sims admitted that she told a detective in March 2009 that Dunn had kicked Torres while Torres was at the foot of the staircase. *Id.* at 538-39. However, she testified that the detective had insisted that Dunn must have kicked Torres, and Sims eventually agreed because she felt pressured. *Id.* She maintained that she did not see Dunn kick or otherwise inflict injury on Torres. *Id.* at 540.

[8] Willie testified that he was inside Dunn's apartment when he heard Dunn say, "[D]on't hit me with that bat again. Don't hit me with that bat." *Id.* at 602. Willie said that he walked to the screen door and saw Dunn and Torres fighting on the balcony. *Id.* at 603. He saw Torres hit Dunn on the shoulder with the baseball bat. They began to wrestle over the bat, and then Torres fell down a stair or two, flipped over the banister, and landed face first on the pavement. *Id.* at 604, 609. Willie ran outside and down the stairs, and by the time he "got to the street he [saw] the police," so he flagged them down. *Id.* at 604. Willie also testified that Torres did not move after he landed on the pavement. *Id.* at 636.[1]

---

[1] Dunn implies that Willie testified that Dunn did not kick or inflict injury on Torres, but he does not provide a citation to the transcript. Appellant's Br. at 9.

[9] During closing argument, the prosecutor argued that Dunn had beat Torres with a blunt object but conceded that there was no evidence that the baseball bat found under Torres's body was the murder weapon and no evidence as to how the bat got under his body. *Id.* at 1015. The prosecutor agreed that Torres fell down the stairs but admitted that it was unknown whether Dunn pushed Torres down the stairs or whether Torres tripped and fell down the stairs. However, the prosecutor argued that as a matter of common sense, logic, and science, Torres's injuries were too severe to have been caused by a fall down the staircase and the blood spatter evidence showed that an event occurred at the bottom of the stairs. The prosecutor accused Sims and Willie of having lied based in part on the inconsistencies of their testimony with the conclusions of the expert witnesses. *Id.* at 1018. The prosecutor argued that Sims and Willie were not credible because Collins, an uninterested bystander, said that he saw Dunn and Sims fighting on the balcony, but neither Sims nor Willie mentioned that. The prosecutor pointed out that Sims testified that she and Torres were doing cocaine, but the toxicology report did not show that any controlled substances were present in Torres's body; also, their testimony that they tried to wave down police was not corroborated by the police. The prosecutor told the jury that the case boiled down to whether they were going to believe the people who appeared to be lying or the expert testimony from the professionals.

[10] In contrast, Dunn's counsel urged the jury to believe Sims and Willie, observing that they had nothing to gain by defending Dunn because neither one was a part of Dunn's life anymore. Counsel reminded the jury that no one had

testified that Dunn ever had the baseball bat or that he had hit Torres. Counsel asserted that Torres flipped over the railing, and with a blood alcohol level of .294 had no ability to brace himself for impact, and he landed on his head and fell on the bat, sustaining the injuries to his head, clavicle, and ribs. Counsel argued that Dunn must be innocent because he never fled the scene and none of Torres's blood was found anywhere on Dunn's body. Counsel suggested that the blood spatter may have been caused by the paramedics having stepped in the pool of blood near Torres's head. Counsel noted that Dr. Chrenka had not been able to determine a manner of death and asserted that the blood spatter supported the defense's theory of the case.

[11] The jury found Dunn guilty as charged. The trial court sentenced Dunn to fifty-eight years with two years suspended. Dunn appealed, arguing that the evidence was insufficient to support his conviction. Another panel of this Court concluded that the evidence was sufficient and affirmed his conviction. *Dunn*, 2011 WL 6807366, at *3.

[12] In January 2013, Dunn filed a pro se PCR petition. In September 2016, the State Public Defender filed an amended PCR petition asserting that Dunn's trial counsel provided ineffective assistance by failing to consult with a forensic pathologist prior to trial to determine the manner of Torres's death. The postconviction court conducted an evidentiary hearing. Dunn supported his ineffective assistance claim with the testimony of trial counsel Williams and Dr. Thomas Sozio, a forensic pathologist. Williams testified that he did not consider consulting with a forensic pathologist prior to trial. PCR Tr. at 6. He

explained that he was focused on the lack of evidence that Torres had been beaten with the baseball bat, which he considered the strongest evidence in Dunn's favor, and on the State's position that the blood spatter patterns would not have been the result of a fall, which seemed sensible to him. *Id*. He stated that his focus on these two issues "obscured [his] judgment." *Id*. Williams testified that if he had the case again, he would have another person examine the blood spatter evidence. *Id*. at 14.

[13] Dr. Sozio testified that in his opinion, the cause of Torres's death was blunt force trauma to the head. *Id*. at 31. Dr. Sozio testified that "the manner [of death] is best to be undetermined in this case." *Id*. He stated that the manner of death "could have been an accidental death," explaining that he had seen many instances where a person under the influence of alcohol had fallen down stairs or over a railing and died. *Id*. Dr. Sozio admitted that he was not a blood spatter expert but that his opinion regarding the manner of death was based in part on such evidence. *Id*. at 20-21. He testified that he reviewed the photographs from the crime scene, and he did not see any areas of cast-off blood spatter near Torres. *Id*. at 30.

[14] When asked if Torres's injuries were more likely the result of a fall or a beating, Dr. Sozio answered, "I highly favor a fall." *Id*. at 33. According to Dr. Sozio, the skull fractures and the other injuries were consistent with a fall down the staircase because (a) the skull fractures were linear fractures, which are typical in falls; (b) the skull fractures were not depressed, which is typically caused by blunt force trauma from an object that is swung with high velocity; (c) the

fractures to Torres's ribs were in a straight line on the right side; (d) rib fractures can cause contusions to the lungs; (e) the laceration to the liver was likely caused by one of the broken ribs; (f) the liver was severely fatty, indicative of long-term alcoholism, which in turn made Torres susceptible to "bad clotting times" and osteoporosis; (g) had Torres been beaten, there would have been multiple scalp lacerations rather than one, and he had only one small laceration on an area of the scalp usually associated with falls; (h) Torres had no defensive injuries; (i) the blood spatter on the wall, the car, and the stairway could have been caused by blood spewing from Torres's scalp laceration when he hit the ground; and (j) Torres did not have any "pattern abrasions or contusions," which Dr. Sozio would have expected to see had Torres been beaten with a blunt object. *Id*. at 25-36, 40-41.

[15] On cross-examination, Dr. Sozio conceded that he had no explanation for some of the blood spatter evidence. *Id*. at 41. When shown his report, he admitted that Torres's had a scalp laceration on an area of the scalp that is more indicative of an assault and admitted that the location of scalp injuries was not conclusive. *Id*. at 43-44. Dr. Sozio agreed that a chronic alcoholic could function quite normally with Torres's blood alcohol level and admitted that he had no knowledge as to Torres's level of functioning when he fell. *Id*. at 42-43.

[16] In April 2017, the postconviction court issued an order denying Dunn's PCR petition, which states in relevant part as follows:

> [Dunn] has failed in his burden to develop evidence that establishes that consulting with another expert would have

changed the outcome of the trial. The witness presented by [Dunn] simply provided another expert opinion as to the cause of death of the victim which lacks some credibility when considered in connection with the totality of the evidence presented at trial.

Appealed Order at 8. This appeal ensued.

## Discussion and Decision

[17] Dunn argues that the postconviction court erred in rejecting his claim that his trial counsel provided ineffective assistance. As a petitioner for postconviction relief, Dunn bore "the burden of establishing grounds for relief by a preponderance of the evidence." *Ritchie v. State*, 875 N.E.2d 706, 713 (Ind. 2007). Because Dunn bore the burden of proof, he is appealing from a negative judgment. *Burnell v. State*, 56 N.E.3d 1146, 1149-50 (Ind. 2016). To succeed in his appeal, Dunn must convince us that "the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Wesley v. State*, 788 N.E.2d 1247, 1250 (Ind. 2003). Put another way, Dunn "must convince this Court that there is *no* way within the law that the court below could have reached the decision it did." *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002), *cert. denied* (2003). "We review the

postconviction court's factual findings for clear error, but do not defer to its conclusions of law."[2] *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013).

[18] The Sixth Amendment to the United States Constitution protects the right to counsel and the right to effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)), *cert. denied* (2001). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002). To establish prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to establish

---

[2]  Pursuant to Indiana Post-Conviction Rule 6, the court "shall make specific findings of fact, and conclusions of law on all issues presented." Here, the postconviction court's order simply restates the testimony elicited from attorney Williams and Dr. Sozio. Dunn asserts that we should treat such purported findings as surplusage. We observe that mere restatements of testimony are not considered true findings. *Garriott v. Peters*, 878 N.E.2d 431, 437 (Ind. Ct. App. 2007) (citing *Augspurger v. Hudson*, 802 N.E.2d 503, 515 (Ind. Ct. App. 2004) (Sullivan, J., concurring in result)), *trans. denied* (2008); *see also In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003) ("A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z.") (citing *Perez v. U.S. Steel Corp.*, 426 N.E.2d 29, 33 (Ind. 1981)). Accordingly, we will treat the restatements of testimony as surplusage. *Garriott*, 878 N.E.2d at 438 (citing *Perez*, 426 N.E.2d at 33); *see also Bowyer v. Ind. Dep't of Nat. Res.*, 944 N.E.2d 972, 984 (Ind. Ct. App. 2011); *but see Pitcavage v. Pitcavage*, 11 N.E.3d 547, 553 (Ind. Ct. App. 2014) (concluding that because court's findings were specific, detailed, and clearly indicate its theory for its decision, its factual findings satisfied the "spirit of the requirement" for findings); *Weiss v. Harper*, 803 N.E.2d 201, 206 n.8 (Ind. Ct. App. 2003) (observing that a strict reading of *Perez* "appears applicable only to administrative fact-finding").

either deficient performance or prejudice will cause the claim to fail, but most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *French*, 778 N.E.2d at 824.

[19] Before addressing the specifics of Dunn's ineffective assistance claim, we note that the judge who presided over Dunn's original trial is also the judge who presided over the postconviction proceedings. In such a case, the judge is uniquely situated to assess whether trial counsel's performance fell below an objective standard of reasonableness and whether, but for counsel's unprofessional conduct, there was a reasonable probability that a different verdict would have been reached. *McCullough v. State*, 973 N.E.2d 62, 75 (Ind. Ct. App. 2012) (citing *State v. Dye*, 784 N.E.2d 469, 476 (Ind. 2003) (noting that because judge presided both at original trial and postconviction hearing, judge was in "an exceptional position" to assess weight and credibility of factual evidence and whether defendant was deprived of fair trial)), *trans. denied* (2013). Thus, a postconviction court's findings and judgment should be entitled to "greater than usual deference" when the postconviction judge is the same judge who conducted the original trial. *Id.*; *accord McKnight v. State*, 1 N.E.3d 193, 200 (Ind. Ct. App. 2013); *Hinesley v. State*, 999 N.E.2d 975, 982 (Ind. Ct. App. 2013), *trans. denied* (2014).

[20] Dunn contends that his trial counsel provided ineffective assistance by failing to consult a forensic pathologist before trial as to the manner of Torres's death. We note that although effective representation requires adequate pretrial investigation and preparation, it is well settled that we should resist judging an

attorney's performance with the benefit of hindsight. *Badelle v. State*, 754 N.E.2d 510, 538 (Ind. Ct. App. 2001), *trans. denied*. Accordingly, counsel's judgments regarding investigation and preparation are entitled to a great deal of deference. *Boesch v. State*, 778 N.E.2d 1276, 1283 (Ind. 2002). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Ritchie*, 875 N.E.2d at 714. "In addition, establishing failure to investigate as a ground for ineffective assistance of counsel requires going beyond the trial record to show what the investigation would have produced." *McKnight*, 1 N.E.3d at 200 (citing *Woods v. State*, 701 N.E.2d 1208, 1214 (Ind. 1998), *cert. denied* (1999)). "'This is necessary because success on the prejudice prong of an ineffectiveness claim requires a showing of a reasonable probability of affecting the result.'" *Id*. (quoting *Woods*, 701 N.E.2d at 1214).

[21]    Here, the postconviction court concluded that Dunn failed to establish prejudice. Like the postconviction court, we too find that Dunn's claim can be resolved based solely on whether the evidence produced from consultation with a forensic pathologist would have had a reasonable probability of affecting the outcome of Dunn's trial. Dunn contends that a forensic pathologist would have provided evidence to support the position that "Torres's injuries could have been caused by a fall." Appellant's Br. at 18. Dunn explains,

> Dr. Sozio testified that Torres's injuries were consistent with a
> fall and inconsistent with a beating, that Torres likely had not
> been beaten with a blunt object, that Torres was more susceptible
> to severe injuries because of his alcoholism, and that the blood

> spatter may have been caused by a fall. Expert testimony to that
> effect combined with the testimonies of [Sims] and Willie and the
> State's inability to identify a murder weapon may well have led
> the jury to find that Torres's injuries had been caused by a fall,
> not a beating. Given that this was the key issue at trial, the
> impact of Dr. Sozio's testimony cannot be overstated.

*Id*. Dunn maintains that with Dr. Sozio's testimony, there is a reasonable probability that he would have been acquitted because the "jury did not know that Torres's injuries were consistent with a fall, that Torres was more susceptible to injury due to long-term alcohol use, or that Torres's body lacked telltale signs of a beating. Appellant's Reply Br. at 5.

[22] Although Dr. Sozio's testimony may have been helpful to the defense's theory of the case, when viewed in conjunction with the totality of the evidence at trial, his testimony is not so compelling that there is a reasonable probability that had it been offered the jury would have concluded that Torres's injuries were solely the result of a fall. First, Dr. Sozio's testimony is not as definitive as Dunn suggests. Notably, Dr. Sozio did not conclusively identify the manner of Torres's death as an accident. Although Dr. Sozio testified that he favored a fall over a beating, he concluded that the manner of Torres's death was "best to be *undetermined* in this case." PCR Tr. at 31 (emphasis added). Dr. Sozio testified that Torres's death "could have been" accidental, because Dr. Sozio had seen many instances where someone under the influence of alcohol had fallen down stairs or over a railing and died. *Id*. However, Dr. Sozio agreed that a chronic alcoholic could function quite normally at Torres's blood alcohol

level and admitted that he had no knowledge as to Torres's level of functioning when he fell. *Id*. at 42-43. Further, even though Dr. Sozio testified that it is "highly unlikely that Torres was struck by a blunt object," he was referring only to Torres's rib injuries. *Id*. at 37.

[23] The State's forensic pathologist testified in detail regarding Torres's injuries and conclusively opined that the manner of death was homicide and that Torres's injuries could not have been caused by a fall. The State's blood spatter expert provided compelling testimony that supported the forensic pathologist's conclusions. Marks testified that the blood spatter seen in multiple locations at the crime scene would not have occurred from someone just falling down the stairs, that the blood spatter on the wall indicated that an "event" occurred at the bottom of the stairs and that a "good amount of energy was being applied to a blood source," and that the cast-off blood spatter indicated that an object with a large amount of blood on it had been swung or thrown. Trial Tr. at 920. Dr. Sozio admitted that he was not a blood spatter expert, and his opinion that he favored a fall was based in part on his assessment of the blood spatter evidence that was at odds with Marks's. Dr. Sozio testified that he did not see any cast-off blood spatter on the pavement around Torres's body. PCR Tr. at 30. He opined that some of the blood spatter on the wall, pavement, and car could have been thrown from a person hitting a pool of blood on the pavement or falling, but he admitted that he had no explanation for some of the blood spatter at the crime scene. *Id*. at 40-41. Also, Dr. Sozio admitted on cross-examination that Torres had a scalp laceration on an area of the scalp that is

more indicative of an assault and conceded that the location of scalp injuries was not conclusive. *Id*. at 43-44.

[24] In addition, while Dr. Sozio's testimony would have provided some support for Sims's and Willie's testimony, his testimony was not definitive and their testimony suffered credibility issues. Parts of their testimony were in conflict with Collins's and uncorroborated by the officers who first arrived at the scene. Sims testified that she and Torres had been doing cocaine, but according to the toxicology report, there was no cocaine in Torres's body. Sims admitted that she had told a detective that she saw Dunn kick Torres, but claimed that that was a lie.

[25] Finally, there were facts that supported the State's common-sense argument that Torres's injuries could not have been caused merely from the fall. The second-story balcony was six feet from the ground, yet Torres suffered severe injuries to three areas of his skull as well as his torso. Based on this record, we cannot say that the evidence as a whole leads unerringly and unmistakably to the conclusion that the evidence produced from consulting with a forensic pathologist would have changed the outcome of Dunn's trial. *See Wesley*, 788 N.E.2d at 1250. Accordingly, we affirm the postconviction court's denial of his amended PCR petition.

[26] Affirmed.

Vaidik, C.J., and Mathias, J., concur.